OPINION
{¶ 1} Defendant-appellant Terence Jacocks appeals his conviction and sentence from the Stark County Court of Common Pleas on one count of involuntary manslaughter in violation of R.C. 2903.03. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On May 31, 2002, the Stark County Grand Jury indicted appellant and two other co-defendants on one count of felony murder in violation of R.C. 2903.02(B). The victim's name was Woodrow Washington. At his arraignment on June 21, 2002, appellant entered a plea of not guilty to the charge. The matter then proceeded to a joint jury trial with the two co-defendants, Jason Maske and Donta Mustin. The following evidence was adduced at trial.
 {¶ 3} On April 3, 2002, and into the early morning hours of April 4, 2002, Kristin Somers was at The Pub, a bar and nightclub, with two friends, Leanne Howard and Angie Allen. At approximately 2:30 a.m., after the last call, the three went to Howard's car in the parking lot to leave. As the three were in the car, they were approached by a young man in a yellow Pontiac Fiero, whom Sommers referred to as "Todd",[1] who came up to the car and began talking to them and asking them to go to breakfast. As "Todd" was talking to them, a woman in a car asked him if he could move his car so that she could get out. Somers testified that "Todd" "said basically no." Transcript, Volume IV at 511. According to Somers, two black men then stepped in and "Todd" and two of the men started fighting. Shortly after the fighting started, a dark colored Corvette pulled into the parking lot and a "really tall, light complected black man" got out of the car and went into his trunk. The man was Woodrow Washington, the victim herein. Transcript, Volume IV at 514. When asked whether, when he returned from the trunk, Washington had anything in his hands, Somers responded in the negative.
 {¶ 4} According to Somers, Washington then joined in the fight. The following testimony was adduced when Somers was asked what happened after he began to fight:
 {¶ 5} "A. He started fighting with one of the gentlemen, and it didn't last but for a few seconds. I don't remember seeing any really landed hits or anything.
 {¶ 6} "Q. Okay.
 {¶ 7} "A. But Woody [Woodrow Washington] ended up slipping and he fell backwards.
 {¶ 8} "Q. Okay. Were you able to see him actually fall?
 {¶ 9} "A. Yes.
 {¶ 10} "Q. And you said he fell backwards?
 {¶ 11} "A. Yes.
 {¶ 12} "Q. All right. About how long was it after he joins in this fight would you say that happened?
 {¶ 13} "A. Maybe 15, 20 seconds.
 {¶ 14} "Q. Okay. Could you see him hit the ground?
 {¶ 15} "A. Yes." Transcript, Volume IV at 516-517. Washington hit his head on the pavement. As Washington was laying flat on his back on the ground with his arms and legs straight out, appellant, Maske and Mustin began stomping on his face and chest. Somers testified that three men jumped or stomped on Washington more than ten times and that all participated "pretty much" equally.[2] Transcript, Volume IV at 520. Somers further testified that Washington never moved once he hit the ground. After Somers yelled at the men that they were "going to fucking kill him", they stopped. Transcript, Volume IV at 521. The following testimony was adduced when Somers was asked whether she saw or heard them do anything after that:
 {¶ 16} "A. Yes.
 {¶ 17} "Q. What? . . .
 {¶ 18} "A. Once I got out of the car, they were all jumping around. Jason [Maske] was tapping on his arms yelling I'm a killer, yeah, I am the one that did this to you, look at you now pretty much mocking, you know, what they had just done, giving each other high-fives, that they was just — you know.
 {¶ 19} "Q. Okay. Where were they when they were doing this?
 {¶ 20} "A. Same place, same as they were walking around in, just all around that general vicinity." Transcript, Volume IV at 521-522.
 {¶ 21} According to Somers, Angie Allen then helped her roll Washington, who had blood all over his face and who was gurgling, onto his side and Allen then got the license plate of the three men. Somers, who testified that she was the first person who went over to Washington after the men were done stomping on him, testified that Washington did not have any kind of weapon on him.
 {¶ 22} On cross-examination, Somers admitted that in her written statement to police, she had stated that three men had jumped Washington and knocked him out. Somers further conceded that her testimony at trial differed from her written statement to police.
 {¶ 23} Upon recall by the defense, Somers later admitted that she had told the grand jury that Washington had a bottle in his hands during the incident. However, Somers testified that she did not recall the bottle when she initially testified at trial.
 {¶ 24} Angie Allen also testified at trial. Angie Allen testified that when Washington, the victim herein, got out of his car, he went to his trunk and "[i]t looked like he was just kind of feeling around in the trunk." Transcript, Volume VI at 1032. According to Allen, when Washington went over to the men who were fighting, he did not have anything in his hand Allen testified that the fight between Washington and one of the men, who was short and stocky, lasted approximately a minute and that Washington then slipped and fell to the ground and hit the pavement hard. Allen further testified that while Washington, who was not moving, was on the ground on his back with his arms flat out, the three men started stomping on his chest and face "with full force for two minutes or more." Transcript, Volume VI at 1036. At trial, Allen identified appellant and Jason Maske as two of the men and testified that Maske did most of the stomping. According to Allen, Maske was yelling "I'm a killer." Transcript, Volume VI at 1043. As Somers was tending to Washington, Allen ran over and got the license plate number of the car that two of the men had gotten into after the incident. On cross-examination, Allen admitted that, in her written statement to police, she indicated that Washington was knocked out by three men.
 {¶ 25} Leanne Howard testified similarly to Kristin Somers and Angie Allen. However, Howard only identified appellant and Maske as participating in the stomping and jumping.
 {¶ 26} All three women picked appellant and his two co-defendants out of photo lineups and gave written statements to the police.
 {¶ 27} Nikki Kelly, the general manager at The Pub, also testified at trial. Kelly testified that when she went outside the club to assist Washington, she saw a number of gentlemen screaming and yelling. The following testimony was adduced when she was asked whether she recalled anything that was being yelled or screamed:
 {¶ 28} "A. Yes.
 {¶ 29} "Q. Okay. You can go ahead and use the words that you remember if you remember them.
 {¶ 30} "A. 305, somebody was screaming 305,[3] motherfuckers, 305, you are dead or we are not afraid to kill, 305, motherfuckers, they screamed at the top of their lungs repeatedly.
 {¶ 31} "Q. Was there more than one person saying that?
 {¶ 32} "A. I believe there was just one person saying, but there was a number of young gentlemen, I would say two of them at least standing in the area where I was walking.
 {¶ 33} "Q. So two in addition to the one that you just described?
 {¶ 34} "A. I would say I saw two for sure. There may have been another one.
 {¶ 35} "Q. Okay. The individual that was saying this or the individuals who were saying these things, was there any physical actions that were going along with that?
 {¶ 36} "A. They were just jumping up and down and using their arms, . . ." Transcript, Volume IV at 679-680. According to Kelly, the "one that was screaming 305 was either hitting his chest or his upper arm and screaming it at the same time." Transcript, Volume IV at 680. Kelly, who had met Washington earlier in the evening, testified that she could not recognize his face. As the individuals were leaving, Kelly wrote the license plate number of one of their vehicles on Angie Allen's arm.
 {¶ 37} At trial, Summer Smith was called on direct examination by Jason Maske, one of the co-defendants. Smith testified that she and her stepsister, Amy Nivert, were both friends with Donta Mustin, appellant's co-defendant, and that she had dated Maske for a brief time and was friends with him. Smith testified that due to her friendship with both Mustin and Maske, she knew appellant. Smith testified that when she left The Pub with Nivert, Musitn, Maske and appellant on the evening in question, a yellow Fiero pulled up and the driver got out and went over to speak with three or four girls in another car. According to Smith, as the man was walking, Nivert asked him to move his car so that they could leave. After the man, however, refused to do so, appellant and Maske asked him to move his car. According to Smith, a Corvette then pulled up and the driver got out of the car. The following testimony was adduced when Smith was asked what happened when the man first got out of the car:
 {¶ 38} "A. He jumps up, and he starts speaking to the man that was driving the Fiero.
 {¶ 39} "Q. What does he say to the man in the Fiero?
 {¶ 40} "A. He say what's up, dog, need my help.
 {¶ 41} "Q. Wait, you have to speak slowly.
 {¶ 42} "A. He said what's up, dog, do you need my help.
 {¶ 43} "Q. Does the man in the Fiero speak to him?
 {¶ 44} "A. Yeah, he replies back yes, I am about to beat this guy's ass.
 {¶ 45} "Q. Who was he referring to?
 {¶ 46} "A. Jason, as far as I can tell.
 {¶ 47} "Q. All right. And do did the man in the Corvette say anything else?
 {¶ 48} "A. He said do you need me to get my heat out of the trunk.
 {¶ 49} "Q. And did the man from the Fiero comment?
 {¶ 50} "A. I don't remember what he said, if he said anything at that time. Transcript, Volume X at 1987-1988.
 {¶ 51} According to Smith, the man in the Corvette, who was Woodrow Washington, popped open his trunk and was "digging in the trunk as if he were digging for his heat or whatever . . ." Transcript, Volume X at 1989. Smith testified that as the man came out of the trunk, he made a motion as if he was putting something in his belt pants. Smith, however, did not see if there was anything in his right hand Washington then went over to where everyone was standing, raised a beer bottle and tried to hit appellant over the head with the same. Smith testified that, shortly thereafter, Washington hit Donta Mustin, who was just standing there, in the back of the head and that, in response, Mustin hit Washington in the jaw. According to Smith, Washington stepped back and fell to the ground and, while he was on the ground, Jason Maske "starts walking over towards him, and he kicks him in like the shoulder, neck area." Transcript, Volume X at 1996. When asked whether Washington was moving prior to being kicked by Maske, Smith testified that she saw his arm raised in the air. Smith also testified that Maske only kicked Washington once and that no one else kicked him. According to Smith, she then grabbed Maske's arm and the group left the scene.
 {¶ 52} At trial, Amy Nivert, Smith's stepsister, testified that she had known Jason Maske for about six years and was good friends with him and that she had known Donta Mustin a little bit longer. Nivert testified that she had only met appellant a few times. Similarly to Smith, Nivert testified that Washington attempted to hit appellant with a bottle and that, during the fight that ensued, Washington went over to his car and made a motion inside of his open trunk. When asked, Nivert testified that she did not see anything in Washington's hands. According to Nivert, Washington then hit Donta Mustin in the back of the head and, after Mustin punched Washington in the face, Washington fell to the ground. Nivert testified that while she did not see Washington get hit, she did see him fall.
 {¶ 53} Detective Steve Johnson of the Jackson Township Police Department, who was the lead investigator in the case, testified that, based on one of the license plate numbers that the witnesses provided, the police located one of the cars, a black Cadillac, in which the defendants had left the scene, at a house in Canton. Both appellant and Jason Maske were present in the house. The Detective, who was able to determine that both had been in the black Cadillac, arrested both men and also collected their clothing and shoes from the house. Several days later, Donta Mustin voluntarily turned himself in to police. DNA from blood smears on Jason Maske's shoes was matched to Washington's DNA.
 {¶ 54} After the incident at The Pub, Washington was taken to Mercy Medical Center, where he was treated by Dr. Kirby Sweitzer, the Director of Trauma Services. At trial, Dr. Sweitzer testified that when Washington was brought in on April 4, 2002, he was completely unresponsive and that, after his heart had stopped beating completely, he had been resuscitated. According to Dr. Sweitzer, Washington had bruising to the right side of his chest, multiple, complex facial fractures, including fractures on both sides of his nose, a collapsed right lung and suffered severe brain injuries. The Doctor opined that at least two blows "with the right force" could have caused the facial fractures. Transcript, Volume IV at 784.
 {¶ 55} Dr. Sweitzer further testified that, after approximately a month in the hospital, Washington, who never regained consciousness, died due to severe pneumonia and infection. According to the Doctor, blunt force trauma was the initiating factor leading to Washington's death. Transcript, Volume IV at 746. Dr. Sweitzer further testified that Washington's injuries were "consistent with several blows of significant force" and that the cumulative effect of repeated blows to Washington's head, face, and neck resulted in the severe brain injury and ultimately, his death. Transcript, Volume IV at 749. When questioned, Dr. Sweitzer testified that it would be very difficult to segregate out the blows to Washington's face or head.
 {¶ 56} At trial, Chief Deputy Coroner P.S.S. Murthy, who performed an autopsy on Washington's body and who ruled the case a homicide, testified that the cause of death was "[c]omplications of blunt force trauma." Transcript, Volume V at 865.
 {¶ 57} Dr. William Cox, the former Summit County Coroner, was called as a defense expert witness at trial. During direct examination, Dr. Cox testified, in relevant part, as follows, when asked whether he had an opinion, based on a reasonable degree of medical certainty, as to whether the blow to the back of Washington's head was the direct and proximate cause of his becoming comatose and later dying:
 {¶ 58} "A. Yes, I do.
 {¶ 59} "Q. What is that opinion?
 {¶ 60} "A. My opinion is that it had a direct effect upon his subsequent comatose conditioned [sic] and demise. Transcript, Volume II at 67-68. However, the following testimony was adduced on cross-examination:
 {¶ 61} "Q. The facts that he gave you about falling during an altercation but followed by repeated kicking and stomping and jumping to his head and chest, certainly you would agree with me that those type of injuries could have begun this chain as well?
 {¶ 62} "A. If I could rephrase that. If you were to ask me did they make a contribution, which is what I think you're trying to get at —
 {¶ 63} "Q. You would agree that they would?
 {¶ 64} "A. There is no way that I could discount that they would not make a contribution.
 {¶ 65} "Q. Exactly, because you can't segregate out the damage caused by one blow versus another, can you?
 {¶ 66} "A. No, I can't.
 {¶ 67} "Q. That would be impossible?
 {¶ 68} "A. I can't do that." Transcript, Volume II at 72-73. Dr. Cox further admitted that, in his first report, he concurred that Washington's death was a homicide and that "Woody died from pneumonia due to neural shock due to brain injury caused by blunt force trauma in the form of multiple blows." Transcript, Volume II at 85. When asked whether the kicking and stomping contributed to Washington's death, Dr Cox testified that he could not "discount that they could contribute; . ." Transcript, Volume II at 105. Dr. Cox also conceded that in one of his reports, he found to a reasonable degree of medical certainty that multiple blows to Washington's head and face led to Washington's vegetative state and his pneumonia, which led to his death. Dr. Cox agreed that Washington's facial fractures were caused by significant force.
 {¶ 69} At the conclusion of the evidence and the end of deliberations, the jury, on September 25, 2002, found appellant not guilty of murder but guilty of the lesser included offense of involuntary manslaughter involving an aggravated assault. While co-defendant Maske was also found guilty of involuntary manslaughter involving an aggravated assault, co-defendant Mustin was acquitted. As memorialized in a Judgment Entry filed on October 10, 2002, appellant was sentenced to ten years in prison. The trial court, in its entry, ordered that appellant's sentence be served concurrently with his sentence in Stark County Common Pleas Case No. 2002CR0477.
 {¶ 70} It is from his conviction and sentence that appellant now appeals, raising the following assignments of error:
 {¶ 71} "I. Appellant's rights to due process and a fair trial were violated by the prosecuting attorney's failure to disclose exculpatory evidence.
 {¶ 72} "II. The trial court erred in failing to grant separate trials for appellant and his co-defendants.
 {¶ 73} "III. The trial court erred in not allowing trial counsel to see the prior testimony of a witness used by the state for impeachment.
 {¶ 74} "IV. The trial court erred in sentencing appellant in violation of Ohio revised code section 2929.14."
 I {¶ 75} Appellant, in his first assignment of error, argues that his rights to due process and a fair trial were violated by the Prosecuting Attorney's failure to disclose exculpatory evidence as required by Bradyv. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194. Appellant specifically contends that the Prosecutor failed to disclose evidence that Washington, the victim herein, had slipped and fallen to the ground during the fight rather than being punched and falling to the ground. Appellant also takes issue with the State's failure to inform him that Kristen Sommers had testified before the grand jury that Washington had a bottle in his hand and attempted to hit appellant with the same and with the State's failure to inform appellant that Angie Allen had testified before the grand jury that she did not get out of her car because she was concerned that Washington had gone into his trunk to get a gun.
 {¶ 76} In Brady, supra, it was established that the prosecution's failure to disclose evidence favorable to the accused upon request constitutes a violation of the Fourteenth Amendment's due process guarantee of a fair trial when "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87; see, also, State v. Johnston (1988),39 Ohio St.3d 48, 529 N.E.2d 898. This opinion was incorporated into Ohio's Crim.R. 16(B)(1)(f), which provides "[u]pon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment." Brady, supra, requires the disclosure only of "material" evidence, and evidence is "material" only if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Johnston, supra, at paragraph five of the syllabus, followingUnited States v. Bagley (1985), 473 U.S. 667, 105 So. Ct. 3375.
 {¶ 77} As is stated above, appellant argues that his rights to due process and a fair trial were violated by the State's failure to disclose evidence that Washington had slipped and fallen to the ground, striking his head on the pavement, instead of being punched and falling. Appellant notes that while Kristin Sommers and Angie Allen testified at trial that appellant slipped and fell, both Somers and Allen, in their written statements to police, indicated that Washington was jumped by three men. Appellant also argues that the Coroner was never told that Washington had slipped and fallen, striking the back of his head on the pavement, and that "[i]n fact, he stated if an individual fell, hit his head and died of complications it would be an accidental death not homicide."
 {¶ 78} While appellee, in its brief, concedes that it should have turned this information over to defense prior to trial, it argues that there was no Brady violation "because this evidence was not material to determining appellant's guilt or innocence" and would not have affected the outcome of the trial. We concur.
 {¶ 79} At issue in the case sub judice was the cause of Washington's death. At trial, Dr. Sweitzer testified as follows when asked whether he could opine, to a reasonable degree of medical certainty, whether Washington's injuries were consistent with having been punched once with a fall to the ground:
 {¶ 80} "A. Would be difficult to have the injuries to his face with just one blow.
 {¶ 81} "Q. Okay. Is there any way to segregate out the effect of one blow versus another if it is in the same general area with regard to the brain injury?
 {¶ 82} "A. It would be very difficult. It is oftentimes when you have multiple blows, blunt trauma to the face of the head, you will see effects that can not be separated out. One kind of leads to the other.
 {¶ 83} "Q. So they can be sort of cumulative?
 {¶ 84} "A. Yes." Transcript, Volume IV at 747-748. Dr. Sweitzer testified that Washington's injuries were "consistent with several blows of significant force." In turn, Chief Deputy Coroner Murthy testified at trial that Washington's death was a homicide resulting from multiple
blunt force trauma. Finally, as set forth in detail in the statement of facts, Dr. Cox, a defense expert, conceded that, in a report, he found to a reasonable degree of medical certainty that multiple blows to Washington's head and face led to Washington's vegetative state and his pneumonia, which ultimately led to his death. In short, as noted by appellee in its brief, "the testimony of all medical experts indicated that the cumulative effects of the blows caused appellant's [sic] death — not a slip and fall and not a punch and fall." For such reason, we find that evidence about the slip and fall was not material and would not have affected the outcome of the trial.
 {¶ 85} Appellant, in his first assignment of error, also contends that he was denied his right to a fair trial when the State failed to disclose Kristin Somers' grand jury testimony that Washington had a bottle in his hand and attempted to hit appellant with the same. Appellant points out that, in contrast, Somers testified at trial that Washington had nothing in his hands. After the trial court allowed Somers to be recalled by the defense, which had a chance to review her grand jury testimony, she admitted that she had told the grand jury that Washington had a bottle in his hands during the incident, but testified that she did not recall the bottle when she initially testified at trial. Moreover, as is stated above, appellant also takes issue with the State's failure to disclose Angie Allen's grand jury testimony that she did not get out of her car "because she was leery that the decedent went to his trunk to get a gun."
 {¶ 86} We concur with appellee that the failure to disclose the above did not constitute Brady violations. Whether or not the victim had a bottle in his hand and whether or not Angie Allen was leery that Washington went to his trunk to get a gun out of the same are not material since, as noted by appellee, "the real crime was committed after Washington lay motionless on the ground and he was stomped to death." In short, we find that the evidence was not material since there is not a reasonable probability that the outcome of the trial would have been different had the same been disclosed.
 {¶ 87} Furthermore, the trial court, in the case sub judice, allowed defense counsel to review the Grand Jury testimony of Somers, Allen and Howard and allowed defense counsel to recall any witness.
 {¶ 88} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 89} Appellant, in his second assignment of error, contends that the trial court erred in failing to grant separate trials for appellant and Jason Maske and Donta Mustin, his co-defendants. We disagree.
 {¶ 90} Crim. R. 8(B) provides that two or more defendants may be charged in the same indictment if they are alleged to have participated in the same series of acts constituting an offense, or in the same course of criminal conduct. The joinder of defendants and the avoidance of multiple trials is favored in the law because joinder "conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." State v. Thomas (1980), 61 Ohio St.2d 223, 225, 400 N.E.2d 401. R.C. 2945.13 states:
 {¶ 91} "When two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless the court, for good cause shown on application therefore by the prosecuting attorney or one or more of said defendants, orders one or more of said defendants to be tried separately." Crim. R. 14 provides for relief from joinder when a defendant can demonstrate that his rights are prejudiced by joinder.
 {¶ 92} Whether an accused shall be tried separately from a co-defendant is a matter within the sound discretion of the trial court.State v. Torres (1981), 66 Ohio St.2d 340, 421 N.E.2d 1288. Joinder is the rule rather than the exception. The burden is upon the defendant to show good cause why a separate trial should be granted and that the trial court abused its discretion in refusing to do so. A trial court is to grant a severance of defendants "if it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints. . . ." Crim. R. 14. However, "[m]utually antagonistic defenses are not prejudicial per se."Richardson v. Marsh (1987), 481 U.S. 200, 107 S.Ct. 1702. A defendant claiming error in the trial court's refusal to sever offenses or defendants has the burden to affirmatively showing that his rights were prejudiced by the joinder. See Torres, supra.
 {¶ 93} In the case sub judice, Donta Mustin, appellant's co-defendant, filed a motion for a separate trial from his co-defendants.[4] As memorialized in a Judgment Entry filed on July 24, 2002, the trial court stated, in relevant part, as follows: "A hearing was held on the motions, during which the State of Ohio represented on the record that it would not use any of the statements given by any of the defendants during its case in chief. The State of Ohio did reserve the right to use the statements during cross-examination for impeachment purposes." On such basis, the trial court held that Donta Mustin's motion was moot.
 {¶ 94} We concur with appellee that the trial court did not abuse its discretion in failing to grant separate trials for appellant and his co-defendants. The evidence adduced at trial demonstrated that the co-defendants "participated in the same series of acts constituting an offense, or in the same course of criminal conduct." Testimony was adduced at trial that all three men participated in jumping and stomping on the victim, who lay motionless on the ground. Moreover, as outlined in detail in the statement of facts, the medical experts testified that thecumulative effect of the blows resulted in the injuries that led ultimately to Washington's death. The medical experts were unable to segregate out the blow that led to Washington's death.
 {¶ 95} Appellant, in his brief, argues that, because the cases were tried together, the jury was allowed "to hear testimony regarding the actions of co-defendant, Maske that were highly inflammatory. Appellant notes that there was testimony that Maske was screaming "we are not afraid to kill" and referring to himself as a "killer" and that testing revealed that Maske had the victim's blood on his shoe. Appellant also points to the following statements made by the Prosecutor in closing arguments:
 {¶ 96} "In evaluating each, if you want to break it down as to each defendant, let's start with Jason Maske. He engaged in the primary conduct according to the witnesses. He was identified as, as inflicting the most harm from their perspective. He engaged in the celebration and the taunts. He's the one they pointed out to thumping on his arm saying he's a killer and according to Nikki Kelly shouting out the, the numbers 305 or something to that effect. And I point out to you, ladies and gentlemen, that you will receive evidence of a tattoo on Jason Maske's left arm the numbers 35. Potential — I submit to you that that's not just a coincidence. He had the victim's blood on his shoe." Transcript, Vol. 11 at 181-182.
 {¶ 97} However, we note that the jury, after hearing all of the "highly inflammatory" evidence, including all of the testimony about Jason Maske, acquitted Donta Mustin. Thus, the jury was able to separate out the evidence against the different defendants. Moreover, a number of the witnesses testified that Maske screamed "I'm a killer," therefore lessening the likelihood of jurors attributing the guilt of one co-defendant with another.
 {¶ 98} Appellant's second assignment of error is, therefore, overruled.
 III {¶ 99} Appellant, in his third assignment of error, contends that the trial court erred in refusing to allow trial counsel to see the prior testimony of a witness used by the State for impeachment. We disagree.
 {¶ 100} During trial, Jason Maske, appellant's co-defendant, called Summer Smith as a witness. During cross-examination by the State, after Smith testified that the car she was driving was facing The Pub, the Prosecutor asked Smith if she recalled giving testimony in the grand jury. The following is an excerpt from the cross-examination:
 {¶ 101} "Q. Okay. Do you recall giving testimony in Grand Jury in this matter?
 {¶ 102} "A. Yes.
 {¶ 103} "Q. Do you recall being asked which direction your car was facing?
 {¶ 104} "A. I'm sure I was.
 {¶ 105} "Q. Do you recall your answer at that time?
 {¶ 106} "A. No.
 {¶ 107} "Q. Wasn't it true that you told them that it was in fact facing the street?
 {¶ 108} "A. I don't recall." Transcript, Volume X at 2022-2023. Appellant's counsel then objected stating as follows: "[u]nless I am missing something, she asked her about Grand Jury. If she has got it, let's see all the testimony.
 {¶ 109} "You can't use something without giving — if she is going to use Grand Jury testimony, then I want to see the transcript. I don't think it is fair — ." Transcript, Volume X at 2023.
 {¶ 110} While the Prosecutor, as an accommodation, agreed to show defense counsel that portion of the grand jury testimony that she was using for impeachment purposes, she refused appellant's counsel's request to see the entire grand jury testimony. The trial court then denied such request. Appellant now maintains that the trial court erred in refusing to allow him to see Smith's entire grand jury testimony. We disagree.
 {¶ 111} Ohio Crim. R. 6(E) provides, in part, that "[d]eliberations of the grand jury and the vote of any grand juror shall not be disclosed." However, if the defense shows a "particularized need" for disclosure that outweighs the need for secrecy, all relevant portions of a grand jury transcript should be produced. State v. Greer (1981)66 Ohio St.2d 139, 420 N.E.2d 982. A "particularized need" exists "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial". State v.Davis (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925. A claim of particularized need cannot be replete with speculation and innuendo. Statev. Stojetz, 84 Ohio St.3d 452, 460, 1999-Ohio-464, 705 N.E.2d 329. Whether to release grand jury testimony "is within the discretion of the trial court." Greer, supra. at paragraph one of the syllabus. A decision to deny release will not be reversed absent an abuse of discretion. Statev. Brown (1988), 38 Ohio St.3d 305, 308, 528 N.E.2d 523, 530. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,450 N.E.2d 1140.
 {¶ 112} We find that the trial court did not abuse its discretion in refusing appellant's request for Smith's entire grand jury testimony since appellant did not show a "particularized need" for the same. At trial, appellant simply argued that he wanted to see the same because "I don't think it is fair. However, appellant did not show that "failure to provide the grand jury testimony will deny the defendant a fair trial". See Davis, supra.
 {¶ 113} Appellant's third assignment of error is, therefore, overruled.
 IV {¶ 114} Appellant, in his fourth assignment of error, argues that the trial court erred in sentencing appellant in violation of R.C. 2929.14. Appellant specifically contends that the trial court erred in sentencing appellant to the maximum sentence, which was the same sentence that co-defendant Jason Maske received. Appellant argues that his sentence was not justified since he apologized at the sentencing hearing, the victim facilitated the offense, and since his criminal background is minimal. We, however, disagree.
 {¶ 115} Pursuant to R.C. 2953.08(G), an appellate court may not disturb a sentence unless it finds by clear and convincing evidence that the sentence is not supported by the record or is otherwise contrary to law. R.C. 2929.14, which governs the imposition of a maximum prison term, reads in relevant part: "(C) Except as provided in division (G) of this section or in Chapter 2925 of the Revised Code, the court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders under division (D)(3) of this section, and upon certain repeat violent offenders in accordance with division (D)(2) of this section."
 {¶ 116} While a recitation of the statutory criteria alone may be enough to justify more than the minimum sentence, it is not enough to justify the imposition of the maximum sentence. The trial court also must provide its reasons. As stated in R.C. 2929.19(B)(2)(d): "The court shall impose a sentence and shall make a finding that gives its reasons for selecting the sentence imposed in any of the following circumstances: * * *
 {¶ 117} "(d) If the sentence is for one offense and it imposes a prison term for the offense that is the maximum prison term allowed for that offense by division (A) of section 2929.14 of the Revised Code, its reasons for imposing the maximum prison term * * *"
 {¶ 118} Thus, a trial court has discretion to impose a maximum sentence if it determines that one of the factors listed in R.C. 2929.14(C) exists.
 {¶ 119} The trial court, at the sentencing hearing in this matter, stated, in relevant part, as follows on the record:
 {¶ 120} "Court has considered the record, the oral statements, the Victim Impact Statements as well as the principles and purposes of sentencing under Revised Code 2929.11 and has balanced the seriousness and recidivism factors under 2929.12.
 {¶ 121} "With respect to sentencing, the legislature, the General Assembly has determined that the overriding purposes of sentencing in the State of Ohio are to punish the offender and protect the public from future crimes by the offender and others.
 {¶ 122} "In considering the factors which this court is bound to consider under the law, this court finds that there are factors indicating that this offense was more serious, and that the injury was exacerbated by the victim's physical condition. The victim indeed suffered serious physical harm.
 {¶ 123} "This particular case presents a situation which is perhaps more difficult in that the families know each other. It is difficult because as stated so eloquently by the number of people who spoke today, everyone loses. Everyone loses in these types of cases.
 {¶ 124} "Woodrow Washington, III is no longer here and Terence Jacocks and Jason Maske, today you are going to be made to take responsibility for your actions, but the impact goes well beyond the three of you. It goes to your families, it goes to your friends.
 {¶ 125} "And there is no doubt in this Court's mind that the families involved are good families, and there is no doubt in this Court's mind that the two of you, Mr. Jacocks and Mr. Maske, could be very productive member of our society, but we all make decisions in our life, and some of those decisions are life-changing decisions.
 {¶ 126} "And you made yours on April 4, 2002. And I believe it was already mentioned that it is perhaps the combination of alcohol, and I will add to that youth, which led to the tragic events in those early morning hours.
 {¶ 127} "And it cannot be underscored enough that the combination of youth and alcohol simply never works. I am certain that in the coollight of day without the alcohol perhaps everyone would have acted differently, but that is not what happened in this case.
 {¶ 128} "And the court must deal with the facts as they are and the Court must deal with the decision rendered by the Jury in this case, and the Court respects the decision rendered by the Jury in this case and will sentence accordingly.
 {¶ 129} "The fact is that a life was taken and a life was taken because of something so simple as a parking space and how one was going to leave a parking space.
 {¶ 130} "As you mature in life you have to decide what things are really important and what things you should become passionate about. And the way someone exits a parking space, I submit, is not one of those things that should result in any sort of confrontation.
 {¶ 131} "Sometimes as adults we have to learn to walk away. Sometimes as adults when the teachers are no longer around the parents are no longer around we have to make our own decisions. We have to exercise good judgment, and to be sure, good judgment was not exercised on this evening.
 {¶ 132} "After the confrontation took place, from the Court's perspective and hearing the facts, there were opportunities where you could take the simple action of just walking away, just walking away from the situation.
 {¶ 133} "One thing we also learn as we become adults is that we just take responsibility for our actions, the choices that we make.
 {¶ 134} "It is unfortunate that the advice and the lessons that I am sure your families taught you growing up, and I heard from two experienced educators who I am sure would have told you to exercise some common sense in these situations, to walk away, but you became involved in this confrontation. Extremely poor judgment was, in fact, exercised. And what sticks out most in this Court's mind is the testimony of witnesses that truly had no involvement in this case other than to witness certain things.
 {¶ 135} "And the one witness that this court recollects is that of the manager, Nikki Kelley. She wasn't friends with either of these families or any of these families, and what she saw ought to give us all pause. She came out and saw people celebrating, celebrating and indicating that they were killers, that I'm a killer.
 {¶ 136} "Today without alcohol is that taunt, that celebration what it was that night or in those early morning hours? To celebrate on the death of another person caused by your own actions. You literally, literally kicked a person when he was down. This went beyond, well beyond helping a friend out, and again, it's all a senseless confrontation regarding someone pulling out of a parking spot.
 {¶ 137} "The Court finds then in issuing its sentence today pursuant to Revised Code 2929.14(B) that the shortest term possible will demean the seriousness of the offense and will not adequately protect the public, and therefore, the Court is going to impose a greater term.
 {¶ 138} "The Court, even though the Court understands that you both come from very good families, the Court is duly bound to look at the facts of this case, and the facts are that because you failed to exercise judgment, because somehow at that moment ego came into play and ego decided that killing a person was something to celebrate.
 {¶ 139} "And because the evidence was such that after this person was down, the kicking began; the Court finds, in fact, that the Defendants have committed the worst form of the offense.
 {¶ 140} "A death was caused. This Court cannot rewrite the facts of this case. This court cannot prescript what everyone chose to do that evening, and because of what occurred, the court finds that, in fact, the maximum term is appropriate, and that is a period of 10 years in prison." Transcript of October 9, 2002, hearing at 43-49.
 {¶ 141} Upon review, we find the trial court properly stated its reasons for imposing the maximum sentence pursuant to R.C.2929.19(B)(2)(d), and made the requisite finding pursuant to R.C.2929.14(C). Furthermore, we find that the trial court's imposition of the maximum sentence was supported by clear and convincing evidence. As is stated above, evidence was adduced at trial that while Washington, the victim herein, was laying defenseless on his back on the ground, appellant participated in a severe beating that, after a month in a coma, led to Washington's death.
 {¶ 142} Appellant's fourth assignment of error is, therefore, overruled.
 {¶ 143} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
Edwards, J., Hoffman, P.J. and Wise, J. concur.
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] The actual name of such individual is Nate Laster.
[2] Sommers testified that the third person was not involved in the fight with "Todd," the man in the yellow Pontiac Fiero.
[3] Jason Maske has a tattoo on his arm with the numbers 35.
[4] While it does not appear appellant filed a motion for separate trials, we shall address the merits of appellant's argument since both parties addressed the issue of separate trials in their briefs.