OPINION
{¶ 1} Defendant-appellant Chaz Bunch appeals from his conviction in the Mahoning County Common Pleas Court of aggravated robbery, three counts of rape, three counts of complicity to rape, kidnapping, conspiracy to aggravated robbery, and aggravated menacing. Firearm specifications were attached to all the above crimes except aggravated menacing. The jury found him guilty of all firearm specifications. Bunch raises numerous issues in this appeal. The first issue presented is whether the defense of duress and the defense of noninvolvement are antagonistic defenses and, thus, the trial court erred when it failed to sever the trials of the co-defendants claiming those defenses. The second issue is whether police officers testifying as to co-defendants' statements presented a Bruton violation thereby requiring severance. The third issue is whether the trial court erred when it failed to grant Bunch's motion for mistrial based upon the state's failure to disclose information that was discovered during the investigation. The fourth issue is whether the cumulative effect of the alleged errors denied Bunch his right to a fair trial. The fifth issue is whether the trial court improperly imposed maximum, consecutive sentences. The sixth issue is whether the convictions were for allied offenses of similar import that required merger. The seventh issue is whether the trial court erred when it allowed both the victim and the victim's father to make statements at the sentencing hearing. The final issue is whether the trial court erred when it failed to merge the firearm specification sentences. For the reasons stated below, Bunch's conviction and sentence is affirmed in part, reversed in part, vacated in part and remanded for resentencing.
 STATEMENT OF FACTS {¶ 2} Early in the evening on August 21, 2001, Jason Cosa, Christine Hammond and Jason's grandfather were returning to Jason's home located at 190 Maywood, Youngstown, Ohio. (Tr. 808, 814). After they had entered the driveway, a man wearing a mask (later admitted to being Brandon Moore), approached the car and robbed them at gunpoint. (Tr. 809-811, 826).
 {¶ 3} Neither Jason nor Christine could identify who the gunman was, but they did notice that he got into an awaiting vehicle that was a dark, older automobile. Both described the car as being dark and very loud. (Tr. 813, 829).
 {¶ 4} Later that night at approximately 10:20 p.m., M.K., a twenty-two year-old Youngstown State University student, arrived at a group home for mentally handicapped women to report to work for the evening; she worked the night shift. (Tr. 850, 854). The group home she worked at was located at 1322 Detroit Avenue, Youngstown, Ohio. (Tr. 855).
 {¶ 5} Upon arriving, she exited her vehicle and went to get her belongings out of the trunk of her car. (Tr. 855). On her way to the trunk, M.K. noticed an older, black automobile (referred to as black automobile) coming up the street and stopping a few houses away. (Tr. 862-863). At this point, she also saw a tall man running through the grass. (Tr. 863). The man wearing a mask, later identified as Brandon Moore, pointed a gun at her and instructed her to give him all her money and belongings. (Tr. 864). The porch light of the group home then came on and Moore instructed her to get into the passenger seat of her car. (Tr. 864). Moore climbed over M.K., positioned himself into the driver's seat, and drove away with her in the car. (Tr. 864).
 {¶ 6} Upon leaving the driveway, Moore, driving M.K.'s car, began following the black automobile. Shortly thereafter, Moore stopped the car and a second gunman exited the black automobile in front of them and entered the victim's car through the rear passenger's side door. (Tr. 870). The second gunman, later identified as Bunch, put a gun to her head and demanded her money and belongings. (Tr. 873). She now had two guns pointed at her, one from Moore and one from Bunch. (Tr. 874). After Bunch had entered the vehicle, Moore began to drive and continued to follow the black automobile.
 {¶ 7} As all of this was occurring, Moore began to compliment M.K. on her beauty. Moore then, while driving, inserted his fingers into her vagina. (Tr. 876-877). Moore was so infatuated with her that he nearly hit the black automobile in front of them. (Tr. 877). It was at this point that M.K. was able to see the license plate of the black automobile. She memorized the license plate number as "CTJ6243." (Tr. 872). While all this was occurring, Bunch still had the gun pointed at her head.
 {¶ 8} At some point while Moore was driving, the black automobile stopped leading and began to follow Moore. Eventually, Moore drove down a dead-end street near Pyatt Street in Youngstown, Ohio, and both automobiles pulled into a gravel lot. (Tr. 879, 881, 1038-1039). Bunch ordered M.K. out of the car. (Tr. 884). Moore and Bunch then took turns orally raping her; one of them would have his penis in her mouth, while the other would force her head down. (Tr. 887-888). Guns were pointed at her while this was occurring. (Tr. 888).
 {¶ 9} After Moore and Bunch were finished orally raping her, they forced her at gunpoint to the trunk of the car. (Tr. 889). At the trunk of the car, she was anally raped. (Tr. 893). While this was occurring one of the individuals from the black automobile, who was later identified as Jamar Callier, went through her belongings in the trunk and took some of the items. (Tr. 890). The other individual in the black automobile stayed in the car the whole time and watched; he was later identified as Andre Bundy.
 {¶ 10} After the anal rape occurred, Bunch threw M.K. to the ground and then Moore and Bunch vaginally and orally raped her. (Tr. 895). While one of them vaginally raped her, the other would orally rape her, and then they would switch places. (Tr. 895-896). Both were armed as this occurred. (Tr. 895).
 {¶ 11} At some point while this was occurring, Bundy told Callier to stop what was going on. As a result, Callier pushed Bunch off M.K., helped her to her feet, and put her in her car. (Tr. 897, 1265-1266). This caused an altercation between Bunch and Callier. (Tr. 899). Bunch wanted to kill M.K., however, Callier told Bunch that he could not kill a pregnant woman. (Tr. 899). During the rapes, M.K. was pleading for her life and as part of that plea she claimed to be pregnant. (Tr. 893). Prior to her leaving, Moore and Bunch told her that they knew who she was and threatened to harm her and her family if she ever told what happened. (Tr. 900).
 {¶ 12} Once in her car, M.K. locked her doors and drove straight to her boyfriend's parents' house. While she was driving she kept repeating the license plate number of the car. (Tr. 902). Upon arriving at the house, the victim was hysterical, but she was able to scream out the license plate number, which someone wrote down. Her boyfriend's parents then immediately took her to the hospital. (Tr. 902). She arrived at the hospital at approximately 11:12 p.m. (Tr. 1029-1030).
 {¶ 13} At the hospital, her boyfriend's father immediately told Officer Lynch from the Youngstown Police Department that M.K. had been raped by individuals in an older black automobile with the license plate number "CTJ6423." (Tr. 1028). Officer Lynch was at the hospital for an unrelated matter, but when this information was given to her, she began broadcasting the plate number and the car's description over the police radio; this occurred at approximately 11:13 p.m. (Tr. 910, 1027, 1029-1030). Officer Lynch then began obtaining further information from the victim, including a detailed description of the assailants and the crimes. Officer Lynch broadcasted the description of the assailants over the police radio.
 {¶ 14} While this investigation was occurring, a sexual assault nurse at the hospital examined M.K. and completed a rape kit. The rape kit included swabs of the victim's mouth, vagina, and rectum. (Tr. 1588-189). Once completed, the rape kit was sealed and taken into police custody. (Tr. 1045-1050).
 {¶ 15} At approximately 11:30 p.m. Youngstown Police Officer Anthony Vitullo, who was on patrol and had heard Officer Lynch's broadcast, pulled his cruiser into the Dairy Mart at the intersection of Mahoning Avenue and Bella Vista. He noticed a black car at pump seven. (Tr. 1061). As the car was pulling out he noticed that the license plate number on the car as "CTJ6243." (Tr. 1061). The plate number was not the exact number that had been broadcasted over the radio, however, the numbers were very close. The number broadcasted over the radio was "CTJ6423." Given that the car matched the description and that the license plate number was very similar to the one broadcasted, Officer Vitullo began following the car.
 {¶ 16} The black automobile pulled onto Mahoning Avenue and headed east toward downtown. (Tr. 1062). It then merged onto I-680 southbound and exited at the first exit, Glenwood Avenue. (Tr. 1063). The black automobile then ran the stop sign, turned southbound on Edwards Street, and pulled into the first driveway on the west side of the street. (Tr. 1063, 1065).
 {¶ 17} Officer Vitullo followed the car the whole time; however, he did not activate his overhead lights. Upon arriving at the Edwards Street address, Officer Vitullo remained at his car waiting for backup before approaching the car. (Tr. 10651-1067). Moments later backup arrived, including Officer Schiffhauer from the YPD K-9 unit. The officers proceeded to the car. Upon reaching the car, the officers noticed that the driver of the vehicle had fled on foot. However, the passengers, Moore, Bundy, and Callier, remained in the vehicle and were subsequently arrested and detained. The passengers informed the police that the driver's name was "Shorty Mack."
 {¶ 18} At that point, the K-9 unit began trying to track the driver of the vehicle. Officer Schiffhauer was unable to track and find the driver, but he was able to determine that the driver headed west. (Tr. 1111).
 {¶ 19} At 11:50 p.m., Youngstown Police Officer Ronnie Jones heard the broadcast that the driver from the suspected automobile had fled on foot. (Tr. 11521-155). He then set up a perimeter and positioned his cruiser on Glenwood Avenue near Bernard Street in Volney Rogers parking lot. (Tr. 1155). Approximately five minutes later Officer Jones noticed Bunch "trotting" by on Glenwood Avenue. (Tr. 1157-1158). Officer Jones placed the spotlight on Bunch and Bunch slowed to a walk. (Tr. 1157-1158). Bunch proceeded to the side door of 349 Glenwood Avenue and began knocking. (Tr. 1158-1159).
 {¶ 20} Lamont Hollingshead lived at 349 Glenwood Avenue. He opened the door when Bunch knocked, but Hollingshead would not let Bunch in because he did not know who Bunch was. Hollingshead testified that Bunch claimed to being chased by the police for a curfew violation. (Tr. 1184-1185). Bunch asked Hollingshead to tell the police he was Bunch's uncle. (Tr. 1184). Believing that the police were after Bunch for a curfew violation, Hollingshead complied with Bunch's request. (Tr. 1184).
 {¶ 21} Officer Jones questioned both Hollingshead and Bunch. Bunch informed the officer that he was sixteen years old, that his name was Chaz Bunch, and that he was on his way from his uncle's house to his cousin's house. (Tr. 1159-1161). Given the explanation and the fact that Bunch did not match the description of the driver that was broadcasted over the police radio, Officer Jones let Bunch go. The description broadcasted over the radio was that the driver was wearing gray sweats and went by the name of "Shorty Mack." (Tr. 1161-1162, 1167-1169). Bunch was wearing navy blue pants, a navy blue top with a white T-shirt underneath it. (Tr. 1164). Moore was wearing gray sweatpants, thus, the wrong description was broadcasted over the radio. (Tr. 1162).
 {¶ 22} After Officer Jones left, Bunch paid Hollingshead to make a telephone call from his house. Bunch called Brandy Miller; Brandy Miller's testimony and telephone records confirmed this. (Tr. 1195-1198, 1572-1573).
 {¶ 23} Three days later, while at roll call, Officer Jones was informed that the subject that fled the automobile on the night of the rape was suspected to be Bunch. Officer Jones informed his superiors that on the night of the rape he had seen an individual who identified himself as Chaz Bunch. Officer Jones was shown a photo array with Bunch in it; he identified Bunch as the individual he saw on the night of the rape. Bunch was subsequently arrested.
 {¶ 24} During the investigation of the rape, the police inventoried the black automobile. In inventorying the car, the police found the victim's belongings. (Tr. 1071-1073, 1097, 1206-1208, 1211-121). The police also found a vehicle registration and credit union card belonging to Jason Cosa. (Tr. 1213, 1251, 1406-1407). Also in the car was a .38 caliber handgun and one blue and one black wave cap. (Tr. 10731-074, 1097, 1208-1209).
 {¶ 25} Additionally, in further investigating the crimes, the police interviewed M.K. On August 22, 2001, M.K. was shown a series of photographic line-ups. (Tr. 910-911, 1425, 1433). She positively identified Bundy as the driver of the dark older automobile that watched the entire time. (Tr. 913, 14488). She also identified Callier as the person who went through her trunk and as the person who stopped the rape. (Tr. 913-914, 1451-1452). She identified Moore as the first gunman who abducted, robbed and raped her. (Tr. 919-920, 1446). She signed each individual photograph indicating the identifications. (Tr. 913, 920, 1446, 1448, 1451).
 {¶ 26} As to Bunch's identification, she was drawn to the photograph of him as being the second gunman, but she informed the detectives that she wanted to see a full body picture before signing the photograph. The police were unable to put together a full body array because they were unable to find juveniles of that build. (Tr. 1450). However, on September 7, 2001, the victim saw a local newspaper which showed a picture of Bunch from mid-chest up. Upon seeing this picture, the victim immediately knew that Bunch was the second gunman and called her victim-witness advocate to inform her of this information.
 {¶ 27} Furthermore, evidence that was obtained during the investigation was sent away for fingerprint and DNA testing. The rape kit was tested at BCI. The semen sample from the vaginal swab, rectal swab and the victim's shorts were not consistent with Bunch's DNA. However, it was determined that Moore could not be excluded; the chance of finding another individual with the same DNA as Moore was one in 94,000,000,000,000,000,000. (Tr. 1670). No fingerprints were found on the .38 caliber gun.
 {¶ 28} The police also obtained the video surveillance from Dairy Mart. Still pictures were made from the video surveillance. The pictures showed Callier and Bunch purchasing food and gas for pump seven.
 {¶ 29} Also, the police conducted interviews with the suspects. On August 22, 2001, Andre Bundy was interviewed by the police. Bundy admitted to being the driver of the black automobile. (Tr. 1419). Bundy also stated that he had Callier stop the rape. (Tr. 1421).
 {¶ 30} Moore was interviewed on August 23, 2001. He informed the detective that he was the individual who robbed Cosa and Hammond. He stated that he was the individual who first approached M.K. and forced her into her car at gunpoint. He then admitted to raping her. (Tr. 1431). However, he claimed that he committed the crimes because an individual known as "Shorty Mack" made him do it. (Tr. 1464). He also claimed that the gun he used that night was a fake. (Tr. 1472).
 {¶ 31} Callier was then interviewed by the police and also testified at trial. (Tr. 1276-1400). He testified that both Bunch and Moore raped M.K. (Tr. 1264). He stated that Bunch was the driver of the black automobile when it left the Dairy Mart. He then stated that once Bunch pulled the car into the house on Edwards Street, Bunch told them to tell the police that he was "Shorty Mack." (Tr. 1274). Callier also saw the pictures from Dairy Mart and indicated that he and Bunch were in the pictures. (Tr. 1276).
 {¶ 32} Bunch was later indicted on three counts of aggravated robbery (count one was for the robbery of M.K., counts two and three were for the robbery of Cosa and Hammond), three counts of rape, three counts of complicity to rape, one count of kidnapping, one count of conspiracy to commit aggravated robbery, and one count of aggravated menacing. Firearm specifications were attached to all counts, except for the aggravated menacing count. Bunch pleaded not guilty to all counts.
 {¶ 33} Numerous pretrial motions were filed by Bunch including a request for discovery and a request for the trial court to order that all law enforcement officials involved in the investigation turn over and advise the state of information acquired during the course of the investigation. The trial court sustained both motions. The state also filed pretrial motions including a motion to join Bunch's case with Moore, Bundy and Callier (prior to Callier entering a plea agreement with the state). The trial court granted the motion and the cases proceeded to trial.
 {¶ 34} The jury found Bunch guilty of ten of the twelve counts. He was found guilty of the three counts of rape, three counts of complicity to rape, one count of aggravated robbery, conspiracy to aggravated robbery, kidnapping, menacing, and all related firearm specifications. He was found not guilty on the two counts of aggravated robbery with firearm specifications that were related to Cosa and Hammond.
 {¶ 35} On October 23, 2002, the trial court sentenced Bunch to maximum, consecutive sentences on all charges except for the misdemeanor menacing verdict, which was ordered to be served concurrently. Accordingly, Bunch was sentenced to serve eighty-eight years for the felonies and twenty-seven years for the firearm specifications, for a total of one hundred fifteen years. Bunch timely appealed from the sentence and conviction raising five assignments of error.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 36} "The trial court erred in joining the appellant's case with Brandon Moore's and andre bundy's case for trial [and subsequently, refusing to sever said cases] based on the existence of antagonistic defenses and the admission of statements of moore and bundy that were inadmissible pursuant to Bruton v. United states, 391 U.S. 123 (1968)."
 {¶ 37} Joint trials "play a vital role in the criminal justice system"; they promote efficiency and "serve the interest of justice by avoiding the scandal and inequity of inconsistent verdicts." Richardsonv. Marsh (1987), 481 U.S. 200, 209-210. Yet, in Ohio, like in the federal system, Crim.R. 14 recognizes that joinder, even when proper, may prejudice either a defendant or the government.
 {¶ 38} Crim.R. 14 states:
 {¶ 39} "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment * * * or by such joinder for trial together of indictments * * * the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires."
 {¶ 40} Joinder is the rule rather than the exception. State v.Vargas, 5th Dist. No. 2001CA00044, 2002-Ohio-2478. The decision of whether to grant a motion for separate trials is a matter resting within the trial court's sound discretion, and a reviewing court will not disturb that decision on appeal absent a showing that the trial court abused its discretion. State v. Torres (1981), 66 Ohio St.2d 340. An abuse of discretion connotes more than just an error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. State v. Adams (1980),62 Ohio St.2d 151.
 {¶ 41} Bunch's argument that the trial court erred by failing to grant his severance motion can be divided into two separate arguments. His first argument is that he was prejudiced by the joinder because he and co-defendant Moore had "mutually antagonistic defenses." The second argument is based upon Bruton v. U.S. (1968), 391 U.S. 123, that statements of non-testifying co-defendants were referenced in trial and these statements implicated him in the crimes. Since he was unable to cross-examine the non-testifying co-defendants, he contends that his constitutional right to confrontation was denied. Each argument is addressed separately.
 A. MUTUALLY ANTAGONISTIC DEFENSES {¶ 42} Defenses are mutually antagonistic where each defendant is trying to exculpate himself and inculpate his co-defendant. State v.Daniels (1993), 92 Ohio App.3d 473, 486, citing Romano v. State
(Okla.Crim. 1992), 827 P.2d 1335. The Ohio Second Appellate District has explained that there are three underlying policy reasons to sever trials of jointly indicted defendants that present mutually antagonistic defenses. State v. Brown (October 11, 1985), 2d Dist. No. 8560. The first policy reason is that when mutually antagonistic defenses are presented, there is fear that the jury will infer that both defendants are guilty solely due to the conflict between the two defenses. Id. citing UnitedStates v. Herring (C.A.5, 1979), 602 F.2d 1220. The second reason is to prevent a situation where the defendant is required to face what amounts to two prosecutors — the state and his co-defendant. Brown, 2d Dist. No. 8560, citing United States v. Lee (C.A.5, 1984), 744 F.2d 1124. The third reason is to prevent the situation where one co-defendant is the government's best witness against the other co-defendant. Brown, 2d Dist. No. 8560, citing Lee, 744 F.2d 1124.
 {¶ 43} To warrant severance, the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. United States v.Berkowitz (C.A.5, 1981), 662 F.2d 1127, 1133; United States v. Crawford
(C.A.5, 1978), 581 F.2d 489; United States v. Sherlock (C.A.9, 1992),962 F.2d 1349, 1363. The essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other. Berkowitz,662 F.2d at 1134; United States v. Tootick (C.A.9, 1991), 952 F.2d 1078,1081. "Such compelling prejudice does not arise where the conflict concerns only minor or peripheral matters which are not at the core of the defense." United States v. Romanello (C.A.5, 1984), 726 F.2d 173,177. One federal court explained that mere finger pointing among co-defendants, i.e. the familiar "he did, not I" defense, normally is not a sufficient ground for severance based upon mutually antagonistic defenses. United States v. Pena-Lora (C.A.1, 2000), 225 F.3d 17, 33.
 {¶ 44} When mutually antagonistic defenses are present, the defenses can prejudice co-defendants to such a degree that they are denied a fair trial. Brown, 2d Dist. No. CA8560. However, even when defendants present antagonistic defenses, such defenses "are not prejudicial per se." Zafirov. United States (1993), 506 U.S. 534, 538. Accordingly, in addition to showing that the defenses are mutually antagonistic, an appellant must also show that he was prejudiced by the mutually antagonistic defenses. Thus, the first issue to be determined is whether Bunch's defense of "I wasn't there," also called the defense of noninvolvement, was mutually antagonistic to Moore's duress defense.
 1. IS A DURESS DEFENSE MUTUALLY ANTAGONISTIC TO A DEFENSE OF NONINVOLVEMENT? {¶ 45} Before and during trial, Moore asserted a duress defense. He claimed that a person by the name of "Shorty Mack" made him commit the crimes. Moore claimed, through counsel, that he was afraid of "Shorty Mack" and thought he would be in physical harm if he did not commit the crimes. Before and during trial, Bunch claimed he was not there and that a person by the name of "Shorty Mack" committed the crimes charged.
 {¶ 46} The state claims that the defenses are not mutually antagonistic. The state contends that mutually antagonistic defenses are only present when, in order to find one co-defendant not guilty, the jury must find the other co-defendant guilty. The state asserts that in the matter at hand, this was not the case. It contends that if the jury believed Bunch's defense, the jury could have found Moore either guilty or not guilty. It explains that the jury could have determined that Bunch was not "Shorty Mack" and, therefore, found him not guilty and the jury could have also believed that "Shorty Mack" made Moore perform the crimes. The state further claims that the jury could have disbelieved both Bunch and Moore and found them both guilty.
 {¶ 47} While Ohio has dealt with the issue of mutually antagonistic defenses, it has not had a specific case that dealt with a duress defense and a noninvolvement defense. However, we do find such a factual scenario in a case decided by the Federal Fifth Circuit Court of Appeals.
 {¶ 48} It held, "severance may be required if only one defendant accuses the other, and the other denies any involvement." Romanello,726 F.2d at 177. However, it also rejected the argument that the defense of duress and the noninvolvement defense were antagonistic defenses.United States v. Swingler (C.A.10, 1985), 758 F.2d 477. Yet, in coming to this determination, the Fifth Circuit Court relied heavily upon the facts of the case. Id.
 {¶ 49} In Swingler, the first appellant claimed noninvolvement in the crimes, while the second appellant claimed he committed the crimes under duress from gang members of the Sons of Silence. Id. Nothing was introduced by the second appellant to show that the first appellant was a member of the Sons of Silence, therefore, the federal appellate court held that without direct accusations against each other there was nothing inconsistent with the defenses to show that they were antagonistic. Accordingly, a claim of duress and a claim of noninvolvement could be antagonistic if the facts support it.
 {¶ 50} In the case at hand, the arguments and the facts presented direct accusations by Moore that Bunch was "Shorty Mack" and Bunch made Moore commit the crimes. During trial, the state introduced evidence, through Callier's testimony, that "Shorty Mack" was Bunch. (Tr. 1276). Moore's attorney, when questioning Callier, reinforced this already established testimony that "Shorty Mack" was Bunch. Furthermore, in closing arguments, Moore's counsel repeatedly stated that Bunch was "Shorty Mack" and argued that Bunch made Moore commit the crimes. (Tr. 1856, 1858-1862).
 {¶ 51} Thus, despite the state's insistence otherwise, we must conclude that Moore and Bunch's defenses are mutually antagonistic. The actual core of Moore's defense is that Bunch made him commit the crimes. See Berkowitz, 662 F.2d at 1134 (stating that defenses are mutually antagonistic when the essence or core of the defenses are in conflict to such a degree that the jury in order to believe the core of one defense must necessarily disbelieve the core of the other). If the jury believed Moore's defense that Bunch made Moore do it, then the jury could not believe Bunch's defense that he was not there. Id. Likewise, if the jury believed Bunch's defense, it could not logically believe Moore's defense that Bunch made him commit the crimes. See id.
 {¶ 52} Yet, our analysis does not stop here, as explained above, presentation of mutually antagonistic defenses are not prejudicial per se. Thus, the next issue to be determined is whether prejudice resulted from the joinder.
 2. DID PREJUDICE RESULT FROM THE JOINDER? {¶ 53} Bunch claims that prejudice did result from the joinder. As proof of this prejudice, he refers this court to Moore's cross-examination of witnesses, the victim M.K., Detective Schiffhauer, Callier and Detective Shuster, and Moore's closing argument. He contends that during cross-examination and closing arguments, Moore tried to introduce evidence against him that painted him in an unfavorable light and brought in other acts evidence that the state would not have been permitted to admit. The state rebuts these arguments contending that the record does not support Bunch's accusation and the other acts evidence was not introduced at trial.
 {¶ 54} The majority of testimony and arguments Bunch complains of clearly do not result in prejudice or the denial of a fair trial. In many instances, Moore's arguments at trial were merely reiterating information that was previously testified to and trying to give it a spin favorable to him.
 {¶ 55} For example, in M.K.'s testimony she testified that Bunch was aggressive and that the mood escalated when Bunch entered the car. (Tr. 936). Moore tried to use this testimony to show that he committed the crimes because Bunch was directing him to and he was fearful of Bunch. However, when Moore's counsel tried to insinuate that Bunch was directing Moore, M.K. stated Bunch was not directing Moore, Moore was acting on his own directive. (Tr. 937, 967, 1013). Moore's cross-examination tactic in this instance was trying to give M.K.'s testimony a favorable spin to him, which it did not accomplish. Accordingly, we find Moore's cross-examination of M.K. was not prejudicial to Bunch.
 {¶ 56} Likewise, Bunch's argument that Moore's cross-examination of Callier prejudiced him because Moore elicited testimony that Bunch was "Shorty Mack" also fails. During direct examination, Callier identified Bunch in the Dairy Mart photographs that were taken on the night of the crimes, as the man he told the detectives was named "Shorty Mack." (Tr. 1276-1277). Callier then indicated that the man he identified to the police as "Shorty Mack" was Bunch. (Tr. 1284). When cross-examined by Moore, Moore asked whether Bunch was "Shorty Mack," Callier once again responded that he was. (Tr. 1315).
 {¶ 57} Moore, asking this question again, did not result in prejudice to Bunch. As shown above, the information was already before the jury through direct examination. Thus, Moore's question was just a reiteration of already established testimony. Furthermore, Callier's testimony was reinforced by M.K.'s testimony that Bunch was one of the perpetrators who raped and kidnapped her.
 {¶ 58} Similarly, Moore's cross-examination of Officer Schiffhauer was also a reiteration of Officer Schiffhauer's testimony on direct examination. On direct examination, Officer Schiffhauer stated that when Bunch was arrested he gave a false name, Eric Cofer. (Tr. 1119). Moore cross-examined Officer Schiffhauer on this information and Officer Schiffhauer reiterated that Bunch gave a false name and date of birth when arrested. (Tr. 1131). The jury had heard this information before cross-examination. Therefore, like above, no prejudice resulted from Moore asking the question on cross-examination.
 {¶ 59} Additionally, Bunch argues Officer Shuster's testimony prejudiced him. Officer Shuster testified that Moore explained that "Shorty Mack" made him commit the crimes. (Tr. 1464). Officer Shuster also testified that through the investigation he learned that the person being referred to as "Shorty Mack" was Bunch.
 {¶ 60} Officer Shuster's testimony did not establish that Moore identified Bunch as "Shorty Mack." In fact, whenever Officer Shuster was discussing Moore's statement, he always referred to the individual who made Moore commit the crime as "Shorty Mack." Accordingly, this testimony was not prejudicial to Bunch, since Bunch was claiming all along that he is not "Shorty Mack" and he was not there when the crimes were committed.
 {¶ 61} Officer Shuster did testify that later he learned that Bunch was the person who Moore was referring to as "Shorty Mack." (Tr. 1510). This conclusion could have been reached from the physical and clothing description M.K. gave of Bunch, that Bunch fit that description, and that he was in the vicinity of the direction that the driver ran that night. Furthermore, Callier already testified that Bunch was "Shorty Mack," and M.K. had already identified Bunch as one of individuals that raped her. Thus, Officer Shuster's testimony was a reiteration of other witnesses' previous testimony.
 {¶ 62} In the same way as the above arguments concerning Moore's cross-examination of witnesses fails, so does Bunch's argument concerning Moore's closing argument. Bunch contends that Moore's closing argument highlights the antagonistic defenses and the prejudice that resulted from joinder. He complains of Moore's argument that the crime was committed because of Bunch, the argument that Bunch is the aggressive one, the statements that Moore is the one who revealed that "Shorty Mack" is Bunch, and that Moore was afraid of Bunch because he thought Bunch would harm his family if he did not commit the crimes.
 {¶ 63} First, the closing argument was just a reiteration of Moore's characterization of the evidence. None of the statements are evidence; they are closing arguments. The jury was instructed as such. Furthermore, the evidence did not necessarily indicate that these statements were true. For example, while M.K. did characterize Bunch as aggressive, she clearly indicated that Bunch was not directing Moore to commit any act. Also, Moore's cross-examination of Callier did not reveal that "Shorty Mack" was Chaz Bunch, the state's direct examination of Callier established that. Moore was just reiterating the previously established testimony. Thus, we cannot conclude that the closing argument was prejudicial to Bunch.
 {¶ 64} While we conclude that the above arguments made by Bunch clearly did not prejudice him, we do acknowledge that some of the testimony he complains about is arguably prejudicial. Bunch contends that Moore's cross-examination of Officer Schiffhauer insinuated the Bunch was a member of the gang the "Bloods" and, as such, portrayed him in a bad light. Bunch also contends the Moore's cross-examination of Callier tried to establish that Bunch had killed a man by the name of Brandon Pete.
 {¶ 65} First, during the cross-examination of Officer Schiffhauer, Moore's counsel asked whether at the time of Bunch's arrest he was wearing a red bandana. (Tr. 1123). Officer Schiffhauer responded that he was. (Tr. 1123). Moore then asked what the red bandana indicated. (Tr. 1123). Bunch objected to this question. (Tr. 1123). Officer Schiffhauer indicated that it could indicate that the person was a member of a gang. (Tr. 1123). Moore then asked what were the names of the top two or three gangs in Mahoning County. (Tr. 1123). Once again, Bunch objected and lodged a continuing objection to the line of questioning. (Tr. 1123). The trial court then held a side bar that was memorialized outside the presence of the jury.
 {¶ 66} At the sidebar, Moore proffered to the court that it was his theory that Bunch was a member of a violent gang and this theory lends credence and is probative of the issue of whether or not Bunch forced Moore to perform the crimes. (Tr. 1124). The trial court then indicated that it felt it was appropriate then to allow Moore to continue this line of questioning. (Tr. 1125). In response to that ruling, Bunch argued that the line of questioning prejudiced him. He contended that gang affiliation implied that the defendants are a part of a gang and that perhaps their acts were some part of a gang ritual or gang initiation especially when viewed in light of the brutal heinous nature of the crimes. (Tr. 1125-1127). The questioning, according to Bunch, prejudiced him because it implies he is a member of a gang. (Tr. 1127).
 {¶ 67} The court then had the following colloquy with Moore's counsel:
 {¶ 68} "The Court: How far do you intend to go, Mr. Billak [Moore's counsel]? What are you intending to get out of this? You already got in that members of particular gangs wear colors and this may be indicative of that.
 {¶ 69} "Mr. Billak: I would ask what gang that is indicative of and if those gangs are known for violent crimes to shootings and to witnesses and the like, if he knows. He is a seven-year veteran, but he is a patrolman.
 {¶ 70} "The Court: I won't let you do that, and I think Mr. DiMartino [Bunch's counsel] is correct in that regard. I will let you identify — have him identify if those colors are indicative of membership of a particular gang and what gang that may be. But what that gang does, unless you have proof that this guy is a member of a gang, you are not going to do that." (Tr. 1128).
 {¶ 71} The side bar then ended and cross-examination resumed. Moore then questioned Officer Schiffhauer as to whether the red bandana could be indicative of a person being a member of the gang known as "The Bloods." (Tr. 1129). Officer Schiffhauer indicated that it could. (Tr. 1129). At that point, Moore tried to question the officer as to what types of activities gangs participate in, however, Bunch objected, another side bar occurred off the record, and when questioning on the record resumed the question was not answered, nor was it asked again. (Tr. 1130).
 {¶ 72} This testimony clearly establishes that at the time of Bunch's arrest Bunch was wearing a red bandana and this might be indicative of him belonging to a gang known as "The Bloods." This line of questioning and the insinuation it creates is troubling.
 {¶ 73} Likewise, Moore's cross-examination of Callier concerning Brandon Pete and the insinuation it creates is also disconcerting. During cross-examination, Moore asked Callier if he was afraid of Bunch and if that was the reason he never told the police that "Shorty Mack" was Bunch. (Tr. 1331). Callier responded that it was. (Tr. 1331). Moore then asked if Callier's fear was based upon what he has known Bunch to do in the past. (Tr. 1331). Bunch then objected and the trial court overruled the objection. (Tr. 1331-1332). Callier confirmed that it was. (Tr. 1332). Moore then asked, "In fact, you know that he killed a man named Brandon Pete?" (Tr. 1332). Bunch once again objected, the court sustained the objection and an in-chambers conference was held outside the presence of the jury. (Tr. 1332).
 {¶ 74} At this conference, the trial court questioned Moore about what his basis was for asking the question. Moore explained that it was part of his defense of duress and that previously the trial court had stated that it would permit him to present evidence of Bunch's prior bad acts. (Tr. 1333). Moore then explained that he had received a copy of a proffer from the state that was given by Callier in preparation for trial. In this proffer, the state asked Callier "Did he [Chaz Bunch] ever make any statements about any other crimes that he had been involved with that might make you fear him?" (Tr. 1334). Callier responded that he did. (Tr. 1334). The state then asked, "And what crime was that?" (Tr. 1334). Callier responded, "A shoot — well, a murdering that occurred with Brandon Pete. And when I seen he got away with that, I knew it, you know, he really can't [sic] harm our family." (Tr. 1334-1335). The state then asked, "How did you know that he was involved in the Brandon Pete murder?" (Tr. 1335). He answered, "He [Chaz Bunch] had — he told me. He said I got to go into my business and, the next thing I know, he come up — he come up dead. * * *" (Tr. 1335).
 {¶ 75} The trial court, after hearing the proffer, explained that the testimony had nothing to do with Moore's defense of duress. (Tr. 1335-1336). It then stated, "I don't know how this relates to your defense of duress whatsoever. But I know that I would not allow the State of Ohio to get that type of voodoo into this trial, and you know what this guy may have done that's unproved misconduct is way out of line." (Tr. 1336). It then explained that what Callier knew was not important, rather, it was what Moore knew about Bunch that affected the defense of duress. (Tr. 1336-1340).
 {¶ 76} At this point, Bunch moved for a mistrial claiming that the mention of Bunch allegedly killing Brandon Pete in front of the jury was "too prejudicial and too overwhelming." (Tr. 1340). He further argued that he did not believe that this could be cured by striking the question and giving the jury a curative instruction. (Tr. 1340).
 {¶ 77} While the trial court may not have been aware of this prejudice at the beginning of trial, at the point the question concerning Brandon Pete was stated, the record discloses the court at that time was having some concerns. (Tr. 1336). If it had determined prejudice would result from the joinder it could have severed at that time. Schaffer v. UnitedStates (1960), 362 U.S. 511, 516 (stating that courts have a "continuing duty at all stages of the trial to grant a severance if prejudice does appear").
 {¶ 78} Ultimately, the question concerning Brandon Pete was never answered. Furthermore, the trial court struck the question and gave the jury a curative instruction. (Tr. 1348). While it is presumed that juries follow curative instructions, given this specific situation where there is a joint trial, mutually antagonistic defenses and a co-defendant alleging the other co-defendant was in a gang and killed a person, the insinuation may be to great to overcome.
 {¶ 79} That said, there are a few glaring points in this case that lead to the conclusion that prejudice did not result from the joinder. First, Bunch was found guilty of all crimes against M.K., however, the jury found him not guilty of the two counts that involved crimes against Cosa and Hammond.
 {¶ 80} As the Second Appellate District explained, one of the reasons prejudice may result from joinder when antagonistic defenses are presented is because there is a fear that the jury will infer both defendants guilty for the sole reason that their defenses conflict. Brown, 2d Dist. No. 8560. Obviously, that did not occur in this situation. Even after all the allegedly prejudicial testimony that Moore offered through cross-examination, the jury still acquitted Bunch on the charges that involved crimes against Cosa and Hammond. Moore, on the other hand, was found guilty of all counts, i.e. he was found guilty of the crimes against M.K. and the crimes against Cosa and Hammond.
 {¶ 81} This finding was supported by the evidence established at trial. As to the charges against Cosa and Hammond, the state offered little to no evidence that Bunch was involved in these crimes. However, Moore's statement to the police clearly implicated himself in these crimes. The jury's finding of not guilty on these charges indicates that the jury was able to separate the evidence against the different defendants and render a verdict in conformity with that evidence. Statev. Jacocks, 5th Dist. No. 2002CA00359, 2003-Ohio-6839.
 {¶ 82} Second, the evidence against Bunch was strong. M.K. identified Bunch as the fourth individual involved in the crime. The physical description she gave of him matched his physical description. The clothing description she gave matched the clothes he was wearing on that night when he was stopped by Officer Jones. Callier also identified Bunch as the driver of the car and as the individual who he told the police was "Shorty Mack." Callier further identified Bunch as the individual with him in the Dairy Mart photographs.
 {¶ 83} The Federal Ninth Circuit Court of Appeals has explained that the touchstone of a reviewing court's analysis is the effect of joinder on the ability of the jury to render a fair and honest verdict. Tootick,952 F.2d at 1082. Considering all of the above, we find that the antagonistic defenses did not prejudice Bunch to the point he was denied a fair trial. The trial court's decision to give curative and limiting instructions as to any problematic or troubling testimony, instead of severing, was the least intrusive means to remedy the situation. Thus, Bunch's argument that prejudice resulted from the mutually antagonistic defenses fails.
 {¶ 84} Hence, our analysis now turns to whether Bunch was denied a fair trial due to an alleged Bruton violation.
 B. BRUTON STATEMENTS {¶ 85} Bunch claims that he was entitled to relief from the joinder when Detective Shuster testified about the statements Bundy and Moore made to the police. The actual statements given by Bundy and Moore were not admitted at trial. Detective Shuster testified about what they said in their statements. In none of his testimony did Detective Shuster refer to Bunch. Rather, he stated that Moore and Bundy told him "they" did this or referred to them as the "four of them." A couple times Detective Shuster stated that Moore referred to one of the men as "Shorty Mack."
 {¶ 86} Bunch contends that the detective's testimony referring to "they," the "four of them," and "Shorty Mack" implicitly inferred that he was talking about Bunch. He argues that this violated his right to confrontation based upon the United States Supreme Court case of Brutonv. United States (1968), 391 U.S. 123.
 {¶ 87} "In Bruton, the Supreme Court held that in a joint trial of two defendants, a confession of one co-defendant who did not testify could not be admitted into evidence even with a limiting instruction that the confession could only be used against the confessing defendant. The rationale of Bruton was that the instruction of a potentially unreliable confession of one defendant which implicates another defendant without being subject to cross-examination deprives the latter defendant of his right to confrontation guaranteed by the Sixth Amendment." State v.Moritz (1980), 63 Ohio St.2d 150, 153, quoting United States v. Fleming
(C.A.7, 1979), 594 F.2d 598, 602.
 {¶ 88} However, the Bruton rule is not absolute. State v. White (Apr. 16, 1998), 8th Dist. No. 72011. The courts have carved out exceptions to the rule in cases where the co-defendant's statements have been redacted to the point where the statements do not name or reasonably implicate the defendant. Id., citing Richardson, 481 U.S. at 211; In re Watson (1989),47 Ohio St.3d 86, 91.
 {¶ 89} In Richardson, the United States Supreme Court stated with respect to the introduction of redacted confessions: "the calculus changes when confessions that do not name the defendant are at issue. While we continue to apply Bruton where we have found that its rationale validly applies * * * we decline to extend it further. We hold that the Confrontation Clause is not violated by the admission of a non-testifying co-defendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Richardson,481 U.S. at 211. See, also, Watson, 47 Ohio St.3d at 91, citing Cruz v.New York (1987), 481 U.S. 186, 193-194 (unredacted non-testifying co-defendant's incriminating pretrial confession violates a criminal defendant's Confrontation Clause rights under the Sixth Amendment to the Federal Constitution); Bruton, 391 U.S. 123.
 {¶ 90} Furthermore, the Ohio Supreme Court has also explained that, "`[T]he Bruton rule applies with equal force to all statements that tend significantly to incriminate a co-defendant, whether or not he is actually named in the statement. The fact that the incrimination amounts to a link in a chain of circumstances rather than a direct accusation cannot dispose of the applicability of the Bruton rule. Just as one can be convicted on circumstantial evidence, one can be circumstantially accused.' Fox v. State (Ind.App. 1979), 384 N.E.2d 1159, 1170." Moritz,63 Ohio St.2d at 155.
 {¶ 91} Here, Officer Shuster testified as to what was contained in Moore's statement to the police. Officer Shuster testified that Moore told the police that after driving away from the house on Detroit Avenue "a second subject jumps into the victim's vehicle." (Tr. 1431). Officer Shuster also testified that Moore told the police that "they" drove to Dairy Mart at Mahoning and Belle Vista to get gas. (Tr. 1432). Moore explained that at this point "two individuals go inside the store." (Tr. 1432). Later on cross-examination from Moore, Officer Shuster testified that Moore stated he performed the crimes "because Shorty Mack told him to." (Tr. 1464). However, prior to this testimony, the trial court explained that this answer was only admitted for the "very limited purpose of allowing you [the jury] to understand why this officer did what he did." (Tr. 1463-1464).
 {¶ 92} Officer Shuster also testified as to what was contained in Bundy's statement to the police. Officer Shuster testified that Bundy told the police "four of them were in the car" that pulled up to the Detroit Avenue house. (Tr. 1419). Bundy also told the police that he told Callier to stop "the other two" men (in raping M.K.). (Tr. 1421). Bundy also indicated that he was the driver when they left the scene of the rape, but there came a point when he was no longer the driver. (Tr. 1424).
 {¶ 93} These are a few of the examples of testimony that Bunch believes violates Bruton. In none of the testimony offered by Officer Shuster as to what Bundy and Moore stated in their statements was Bunch's real name given. While the use of "they," "second subject," "the four of them," and any comparable phrase shows the existence of four individuals and that there was another individual in the car with Moore and Bundy, it does not necessarily indicate Bunch was one of those individuals. Arguably the most damaging of the statements was Moore's claim that "Shorty Mack" made him commit the crimes. This statement could be seen to acknowledge the existence of Bunch, especially when considering the previous testimony from Callier that "Shorty Mack" is Bunch. However, we do not need to come to a conclusion as to whether this statement creates a Bruton violation because even if it did, prejudice did not result from the statement. Other overwhelming uncompromised evidence established Bunch's guilt.
 {¶ 94} In Moritz, the Ohio Supreme Court stated, "A violation of an accused's right to confrontation and cross-examination is not prejudicial where there is sufficient independent evidence of an accused's guilt to render improperly admitted statements harmless beyond a reasonable doubt." Moritz, 63 Ohio St.2d 150, paragraph two of the syllabus. See, also, Chapman v. California (1967), 386 U.S. 18; Schneble v. Florida
(1972), 405 U.S. 427. Furthermore, when a contested statement is not incriminating to a defendant on its face, but is only so when linked with other evidence at trial, a trial court's limiting instruction is enough to restrain the jury from considering the statement for a purpose that would violate the defendant's right to confrontation. State v.Wilkerson, 10th Dist. No. 01AP-1127, 2002-Ohio-5416, ¶ 43, citing Statev. Laird (1989), 65 Ohio App.3d 113, 115-117, citing Richardson,481 U.S. 200. Thus, if sufficient independent evidence was admitted at trial to prove Bunch's guilt and a proper limiting instruction was given, then it would render the improperly admitted statements harmless beyond a reasonable doubt.
 {¶ 95} Here, there is sufficient independent evidence of Bunch's guilt. First, M.K. positively identified him at trial as one of the individuals who raped her. While she did not positively identify him from the photographic lineup, she explained that she thought it was him, but she wanted to see a photographic lineup showing more of the chest area to be 100% sure it was him. Second, M.K.'s physical description given within an hour of the crimes matched Bunch's physical description. She even accurately described the clothes he was wearing. Officer Jones, who set up a perimeter to apprehend the fleeing driver, testified that he spotted Bunch in that perimeter within minutes of setting up the perimeter. He testified as to the clothing Bunch was wearing that night and it matched M.K.'s clothing description. (Tr. 1164). Third, Callier testified on direct examination that Bunch was "Shorty Mack" and that he was the individual who committed the rapes along with Moore. Fourth, testimony from Callier, Officer Vitullo and the Dairy Mart video surveillance photographs established that the black automobile was at Dairy Mart, and Callier and a man having the same physical and clothing description as Bunch were there.
 {¶ 96} All of the above evidence provides sufficient independent evidence of Bunch's guilt. Thus, any alleged Bruton violation is rendered harmless beyond a reasonable doubt if a proper limiting instruction was given.
 {¶ 97} Bunch does not dispute that a proper limiting instruction was given. However, even if he did, this argument lacks merit. The transcript reveals that the trial court did give a proper limiting instruction. (Tr. 1938-1939). Consequently, any argument as to a Bruton violation being prejudicial to the point of requiring a new trial fails. For the reasons stated above, this assignment of error fails.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 98} "The trial court erred in refusing to grant appellant's motion for a mistrial made during trial based upon the state's failure to timely disclose discoverable material."
 {¶ 99} Prior to trial, Bunch filed numerous discovery requests, including requests for all law enforcement officials to turn over and advise the state and Bunch of all information acquired during the course of the investigation. The trial court sustained the motions. However, at trial during the cross-examination of Detective Shuster, it was revealed that the state did not disclose two photographs and the videotape interview of a white male named Dominic Brancho who also went by the name "Shorty Mack." (Tr. 1516-1517). Accordingly, Bunch moved for a mistrial.
 {¶ 100} Bunch's defense at trial was that an individual named "Shorty Mack," along with Moore, Bundy, and Callier committed the crimes and that Bunch was not involved in the crimes. He was also arguing that the police investigation to determine the identity of "Shorty Mack" was inept. Bunch contends that the admission of the Brancho photographs and the state's withholding of the videotape interview of Brancho undermined his defense. Thus, according to him, the trial court erred when it failed to grant his motion for mistrial based upon discovery violations.
 {¶ 101} The state asserts that the trial court did not abuse its discretion in denying the motion for a mistrial. First, the state contends that the photographs did not undermine Bunch's defense; rather, they helped his defense. Part of Bunch's defense was that the police did a lousy job investigating and determining who was "Shorty Mack." The picture and cross-examination show that the police only investigated one other individual known as "Shorty Mack," who in fact looked nothing like the description given by M.K. and looked nothing like Bunch. Thus, according to the state, the photographs helped his defense. Secondly, the state argues that the photographs and videotape interview were never admitted into evidence. Therefore, the state concludes that the jury did not see them and no prejudice occurred.
 {¶ 102} Crim.R. 16(B)(1)(c) states that upon motion of a defendant, the court shall order the state to permit the defendant to inspect and copy any photographs that are within the state's possession which are material to the preparation of the defense. If the state fails to comply with a trial court's discovery order or Crim.R. 16, the court may order such party to permit discovery, grant a continuance, prohibit the party from introducing in evidence the material not disclosed or it may make "such other orders as it deems just under the circumstances." Crim.R. 16(E)(3).
 {¶ 103} The Brancho photographs and videotape were subject to disclosure pursuant to Crim.R. 16(B)(1)(c) and the trial court's order. Neither the state nor the trial court disputed this point. (Tr. 1549, 1552). However, the state's failure to disclose the pictures does not necessarily warrant a mistrial. See Crim.R. 16(E)(3).
 {¶ 104} The decision whether to grant or deny a mistrial is a matter within the trial court's sound discretion. State v. Garner,74 Ohio St.3d 49, 1995-Ohio-168. In exercising that discretion, "a trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." City of Lakewood v. Papadelis (1987), 32 Ohio St.3d 1,5.
 {¶ 105} An appellate court will not disturb a ruling on such a motion unless an abuse of discretion has been demonstrated. An abuse of discretion means more than a mere error of law or an error in judgment; it implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219. A reviewing court should not find that the trial court abused its discretion unless the record discloses: (1) that the state willfully violated the rule; (2) that foreknowledge of the withheld information would have benefited the accused in preparing his defense; or (3) that the accused suffered unfair prejudice as a result of the withheld information. State v. Parson (1983), 6 Ohio St.3d 442, syllabus; Statev. Moore (1988), 40 Ohio St.3d 63, 66. Thus, one of the three factors listed above must be found for this court to conclude that the trial court abused its discretion in denying the motion for a mistrial.
 A. WAS IT A WILLFUL VIOLATION? {¶ 106} The state maintained and the trial court found that the state did not willfully violate the discovery rules. Bunch's trial counsel also agreed that it was not a willful violation. Moreover, on appeal, appellate counsel makes no attempt to argue that the nondisclosure of the photographs and videotape were willful.
 {¶ 107} Regardless, the record reveals that the trial court's determination that this was an inadvertent mistake is correct. The state explained that it did not know that it had the Brancho photographs and videotape because they were labeled with Brancho's name and gave no indication that he went by the name of "Shorty Mack." The prosecutor explained that, "seeing Dominic Brancho [the name on the videotape] did not flag any red lights in my head that this might be related to this case." (Tr. 1552). As such, there was no willful violation.
 B. WOULD FOREKNOWLEDGE HAVE BENEFITED BUNCH IN PREPARATION OF HIS DEFENSE? {¶ 108} Prejudice warranting a reversal requires the defendant to demonstrate that the state's failure to comply with Crim.R. 16(B) "prejudiced his ability to reveal a weakness in the state's case or his ability to present a credible defense more effectively." State v. Spirko
(1991), 59 Ohio St.3d 1, 9. A mere possibility that proper discovery would have altered the outcome of the proceedings is insufficient to demonstrate that the defendant was prejudiced. State v. Today'sBookstore, Inc. (1993), 86 Ohio App.3d 810, 821.
 {¶ 109} Bunch contends that if he had known about the photographs and videotape prior to trial, his trial strategy of misidentification that the police did a poor job of trying to find "Shorty Mack" would have changed. The state contends that foreknowledge would not have benefited his defense and it could be argued that the testimony helped his defense.
 {¶ 110} On cross-examination it was disclosed that after viewing the Dairy Mart video surveillance, Officer Shuster suspected that Bunch was in fact "Shorty Mack." (Tr. 1514). Bunch then asked whether the police had done a search for any other individual who went by the name "Shorty Mack." (Tr. 1515). It was at this point that Officer Shuster disclosed that he thought he had done a search through the local database, which only covers crimes that occur within the Youngstown Police Department jurisdiction, to find a "Shorty Mack." (Tr. 1515). He then stated that there might be a "Shorty Mack" in the database. He elaborated by stating he has photographs of Brancho that is supposedly "Shorty Mack," however, he then added that Brancho is "not dark skinned." (Tr. 1517). The following colloquy then occurred:
 {¶ 111} "Q. He is a Shorty Mack [referring to Brancho], meaning there are more than one Shorty Macks in the street, people that use that name?
 {¶ 112} "A. I don't know that.
 {¶ 113} "Q. You don't know if there's any more than that; correct?
 {¶ 114} "A. No.
 {¶ 115} "Q. So for all you know there could be a person named Shorty Mack who fits a description of what these three young men described that's the actual perpetrator here?
 {¶ 116} "A. There could be." (Tr. 1528).
 {¶ 117} This cross-examination could be used to argue that YPD only looked for a "Shorty Mack" within its own database. It did not look for a "Shorty Mack" who fit the physical descriptions given by M.K. or by Moore or Bundy during their statements. Therefore, this testimony could be seen as further establishing Bunch's defense that he was misidentified and the police did a poor investigation trying to find "Shorty Mack." Thus, Bunch's argument as to foreknowledge fails because he was still able to identify and elaborate on what he perceived to be a weakness in the state's case, i.e. poor police investigation in only looking at one other individual that went by the name "Shorty Mack" who looked nothing like the physical descriptions given by other witnesses.
 {¶ 118} Furthermore, Bunch's argument is that if he had this information his defense strategy "may have changed." He never explains how his defense would have changed or even state that it would have definitely changed. As stated above, the mere possibility that the outcome would have been altered is insufficient to established prejudice. Id. Thus, we cannot conclude that foreknowledge would have benefited Bunch in the preparation of his defense.
 C. DID BUNCH SUFFER PREJUDICE? {¶ 119} In a criminal case, a mistrial should not be ordered "merely because some error or irregularity has intervened, unless the substantial rights of the accused are adversely affected and this determination is, again, in the discretion of the trial court." State v. West (Oct. 27, 2000), 11th Dist. No. 98-P-0132 (citations omitted). See, also, State v.Franklin (1991), 62 Ohio St.3d 118, 127.
 {¶ 120} Bunch claims that his substantial rights were affected by the discovery violation. His argument, like the above argument, is based upon the claim that his defense strategy may have changed had he had the information prior to trial. The state argues that the photographs and videotape were never admitted and, therefore, no prejudice resulted. It then adds that Bunch is ignoring the fact that his innocence was "dealt the fatal blow" when two witnesses identified him, the Dairy Mart video shows him wearing clothing matching M.K.'s description, and the fact that he was in the vicinity on the night of the crimes.
 {¶ 121} First, the state's contention that the photographs and videotape were never admitted into evidence is only partially true. The videotape was never admitted into evidence, however, the photographs were. (Tr. 1817). At first, the state claimed it had no intention of admitting the photographs into evidence. (Tr. 1563). Yet, at the close of the evidence, they were admitted. (Tr. 1817). Thus, the state's argument that Bunch cannot claim prejudice for the photographs' admission when they were not admitted into evidence lacks substance.
 {¶ 122} Second, the trial court determined that Bunch's substantial rights were not affected by the admission of the photographs. Part of the trial court's justification was that the photographs of Brancho were not the evidence that dealt the "fatal blow" to Bunch's defense. Rather, the court reasoned it was the victim's and Callier's identification. (Tr. 1557). The court could have also added to this list the Dairy Mart video surveillance photographs and the fact that Bunch was found within the vicinity of the crime on the night of the rape dressed in clothing matching the description given by M.K. Considering the trial court's reasoning and other evidence, Bunch did not suffer prejudice as a result of the withholding of the photographs and videotaped interview of Brancho. Accordingly, we find that the trial court did not abuse its discretion by denying the motion to grant a new trial. This assignment of error lacks merit.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 123} "The appellant was denied his constitutional right to a fair trial due to the cumulative effects of evidence admitted in violation of the evidence rules and rules of criminal procedure and well established principles of law."
 {¶ 124} Bunch contends that the cumulative effect of all the alleged errors that were raised in the first and second assignments of error establish he was denied the right to a fair trial. The alleged errors he references are the joint trial, Moore's cross-examination that insinuated that Bunch was a gang member, Moore's cross-examination that insinuated that Bunch murdered Brandon Pete and the discovery violations. The state contends that no errors, let alone multiple errors, were committed; therefore, Bunch was not denied a fair trial.
 {¶ 125} As for the joint trials, gang member cross-examination and Brandon Pete cross-examination, the analysis as to these issues are discussed under the first assignment of error. As stated therein, prejudice did not result from the joinder.
 {¶ 126} The discovery violations are discussed under the second assignment of error. We concluded that no prejudice resulted from the withholding of the Brancho photographs and videotape interview.
 {¶ 127} As no prejudice resulted from the alleged errors, the cumulative effect of the alleged errors is that no prejudice resulted. As such, Bunch was not denied the right to a fair trial. This assignment of error lacks merit.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 128} "The trial court erred in imposing maximum, consecutive sentences upon the appellant."
 {¶ 129} Bunch argues four points under this assignment of error. First, he contends that the trial court improperly imposed maximum sentences for the crimes. Second, he argues the trial court improperly ordered the sentences to be served consecutive to each other. Third, he maintains that since some of the crimes are allied offenses of similar import the offenses should have merged. Lastly, he contends that the trial court erred when it allowed M.K. and her father to both make victim impact statements at sentencing.
 {¶ 130} Prior to addressing those arguments, we first must sua sponte address the adequacy of the indictment as to the conspiracy charge. In one of the companion cases to this appeal, State v. Bundy, 7th Dist. No. 02CA211, 2005-Ohio-___, this court sua sponte ordered the parties to address this issue. Given that Bunch's indictment is similar to Bundy's, Bundy's argument equally applies to Bunch.
 {¶ 131} The argument is that the indictment improperly charged Bunch with conspiracy to commit aggravated robbery because it did not allege one specific, substantial, overt act in furtherance of the conspiracy. The state claims that the above argument is waived because there was no objection to the indictment before or during trial.
 {¶ 132} Crim.R. 12(C)(2) provides that "[d]efenses and objections based on defects in the indictment, information, or complaint (other than failure to show jurisdiction in the court or to charge an offense, which objections shall be noticed by the court at any time during the pendency of the proceeding)" must be raised prior to trial. Crim.R. 33(E)(1) also prohibits a trial court from granting a motion for a new trial because of "[a]n inaccuracy or imperfection in the indictment, information, or complaint, provided that the charge is sufficient to fairly and reasonably inform the defendant of all the essential elements of the charge against him." The Ohio Supreme Court has held that a criminal defendant's failure to object to the indictment before or at trial waives any defect in the indictment. See State v. Lundgren, 73 Ohio St.3d 474,490, 1995-Ohio-0227; State v. Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 61 (reaffirming this general rule of law).
 {¶ 133} Yet, the Ohio Supreme Court did not follow that general rule in State v. Childs, 88 Ohio St.3d 194, 2000-Ohio-298. In Childs, the Ohio Supreme Court affirmed an appellate court's decision to vacate a defendant's conviction for conspiracy because of a defective indictment. It did so even though, as pointed out in the dissent, the defendant failed to object to any deficiency in the indictment before trial. Id. at 200.
 {¶ 134} The Ohio Supreme Court did not specify why it refused to treat the objection as waived. Its failure to do so indicates it accepted the appellate court's rationale in the case being appealed to it, State v.Childs (Sept. 11, 1998), 2d Dist. No. 16325. In that case, the Second Appellate District recognized that Crim.R. 12(C)(2) contains two exceptions to the general rule that a failure to object to an indictment waives the objection: 1) when the indictment fails to show jurisdiction in the court and 2) when the indictment fails to charge an offense. Id. Either of these objections can be raised "at any time during the pendency of the proceeding." Id. The Second Appellate District concluded that an indictment failed to charge an offense. Id.
 {¶ 135} Because the general rule both before and after the Ohio Supreme Court's decision in Childs is that a defendant waives an objection to the indictment if it is not raised before trial, the only way to reconcile Childs is to assume that the Ohio Supreme Court adopted the Second District's rationale and agreed that this particular type of deficiency is a "failure to charge an offense." Thus, Bunch did not waive the alleged error by failing to object to it prior to trial. The state's arguments to the contrary are meritless.
 {¶ 136} Furthermore, any arguments against the contention that the indictment was inadequate are also meritless. Bunch was indicted and convicted for conspiracy in violation of R.C. 2923.01. That statute defines conspiracy as follows:
 {¶ 137} "(A) No person, with purpose to commit or to promote or facilitate the commission of * * * aggravated robbery * * * shall do either of the following:
 {¶ 138} "* * *
 {¶ 139} "(2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.
 {¶ 140} "(B) No person shall be convicted of conspiracy unless asubstantial overt act in furtherance of the conspiracy is alleged andproved to have been done by the accused or a person with whom the accusedconspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed." (Emphasis added).
 {¶ 141} The Ohio Supreme Court held that an indictment is insufficient to charge someone with conspiracy if it does not "allege some specific, substantial, overt act performed in furtherance of the conspiracy."Childs, at syllabus. In Childs, the defendant was charged with conspiracy to commit aggravated trafficking. His indictment on that count read:
 {¶ 142} "`[B]etween the dates of December 2, 1993 and February 13, 1995, in the County of Montgomery, aforesaid, and State of Ohio, with purpose to commit, or to promote or facilitate the commission of Aggravated Trafficking, a violation of Section 2925.03(A)(2) of the Revised Code, did agree with another person or persons that one (1) or more of them would engage in conduct that facilitated the commission of any such offense, and that subsequent to each defendant's entrance into said conspiracy, a substantial overt act was done by each defendant or a person with whom they conspired; contrary to the form of the statute (in violation of Section 2923.01(A)(2) of the Ohio Revised Code).'" Id. at 197.
 {¶ 143} The Supreme Court, in affirming the appellate court's decision, stated the following in finding that the Childs indictment was inadequate:
 {¶ 144} "[T]he phrase `a substantial overt act was done' merely recites the generic words of the statute. The words of the indictment are little more than a recitation of the words of R.C. 2923.01(B), which defines the crime of conspiracy.
 {¶ 145} "* * *
 {¶ 146} "Generally, the requirements of an indictment may be met by reciting the language of the criminal statute. See State v. Murphy
(1992), 65 Ohio St.3d 554, 583. * * * However, in this case, the plain words of the statute defining the crime of conspiracy can produce only one conclusion: an indictment for conspiracy requires more than a mere recitation of the exact wording of the statute defining the offense of conspiracy.
 {¶ 147} "* * *
 {¶ 148} "[W]hile the state may satisfy its burden by reciting the exact words of a criminal statute in an indictment for some offenses, an indictment for conspiracy to commit aggravated trafficking pursuant to R.C. 2923.01 must allege some specific, substantial, overt act performed in furtherance of the conspiracy. The state's failure to allege a specific, substantial, overt act committed in furtherance of the conspiracy in count fourteen of the indictment against Childs renders the indictment invalid." Id. at 198-199.
 {¶ 149} Pursuant to Childs, the Ninth District has vacated a conviction based on the following indictment:
 {¶ 150} "`And the Grand Jurors of the State of Ohio, within and for the body of the County of Summit aforesaid, on their oaths in the name and by the authority of the State of Ohio, DO FURTHER FIND AND PRESENT that RICHARD DWIGHT CALLAHAN, on or about the 6th day of August, 2000, in the County of Summit and State of Ohio, did commit the crime of CONSPIRACY TO COMMIT ILLEGAL MANUFACTURE OF DRUGS in that he did aid or abet another to knowingly manufacture or otherwise engage in any part of the production of Methamphetamine, a Schedule II controlled substance, in violation of Section 2925.04(A)/2923.01 of the Ohio Revised Code, A FELONY OF THE THIRD DEGREE, contrary to the form of the statute in such case made and provided against the peace and dignity of the State of Ohio.'" State v. Callahan, 9th Dist. No. 20432, 2001-Ohio-1512.
 {¶ 151} The Eleventh District acted likewise based on this indictment:
 {¶ 152} "THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about November 1996 through and including April of 1998, at Trumbull County, Ohio, PHIL F. GEORGE, JR., with purpose to commit, promote, and/or facilitate the commission of engaging in a pattern of corrupt activity, with Samuel Lefter, James J. Futey, David Griffing, William Kush, and/or George Teringo and/or other unindicted or unknown co-conspirators, plan or aid in planning the commission of such offense, or agree with Samuel Lefter, James J. Futey, David Griffing, William Kush and/or George Teringo, and/or other unindicted or unknown co-conspirators, that one or more of them would engage in conduct which facilitates the commission of engaging in a pattern of corrupt activity, a substantial overt act in furtherance of the said conspiracy having been done by PHIL F. GEORGE, JR., or a person with whom he conspired, subsequent to the said PHIL F. GEORGE, JR.'s, entrance into the conspiracy." State v. George (Dec. 22, 2000), 11th Dist. No. 99-T-0163.
 {¶ 153} In the matter at hand, the eleventh count of Bunch's indictment charged him with conspiracy to commit aggravated robbery. It provides:
 {¶ 154} "The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County of Mahoning, on their oaths, and in the name and by the authority of the State of Ohio, do find and present that on or about August 21, 2001, at Mahoning County, CHAZ DIONYOUS BUNCH did, with purpose to commit, promote or facilitate the commission of Aggravated Robbery with Brandon Moore, Andre Bundy and Jamar Callier plan to [sic] aid in planning the commission of such offense. In violation of Sections2923.01(A)(1) and 2911.01(A)(1)(C) of the Revised Code, Felony of the Second degree, against the peace and dignity of the State of Ohio."
 {¶ 155} This indictment is, for all practical purposes, the same as those in Childs, Callahan, and George; it merely tracks the language of R.C. 2923.01. It fails to allege a specific, substantial, overt act. Thus, the indictment is insufficient to charge Bunch with conspiracy to commit aggravated robbery. We have reached this same conclusion in the appeals of co-defendants Bundy and Moore.
 {¶ 156} Thus, for the aforementioned reasons, we must vacate Bunch's conviction and sentence for conspiracy to commit aggravated robbery and dismiss count eleven of the indictment. We also vacate and dismiss the concomitant firearm specification. This determination renders any arguments as to the correctness of maximum, consecutive, or gun specification sentences on the conspiracy charge moot.
 {¶ 157} As an aside, we do note that if the state so chooses, it may refile the conspiracy charge against Bunch. See Crim.R. 12(J) (stating that "[i]f the court grants a motion to dismiss based on a defect in the institution of the prosecution or in the indictment, information or complaint, it may also order that the defendant be held in custody or that the defendant's bail be continued for a specified time not exceeding fourteen days, pending the filing of a new indictment, information or complaint"). See, also, State v. Broughton (1991), 62 Ohio St.3d 253, 266;State v. Duncan, 154 Ohio App.3d 254, 2003-Ohio-4695; Childs, 2nd Dist. No. 16325. However, if the state chooses to take this course of action, the new indictment must be consistent with the requirements explained in Childs and in this opinion.
 A. MAXIMUM SENTENCES {¶ 158} Now, we will address Bunch's maximum sentences issues. In reviewing any sentence imposed for a felony, we cannot reverse, vacate, or modify the sentence unless we clearly and convincingly find either that the record does not support the sentencing court's findings or that the sentence is otherwise contrary to law. R.C. 2953.08(G)(2).
 {¶ 159} When sentencing an offender, the trial court must consider several aspects of the sentencing statutes. First, the overriding purposes of felony sentencing must be followed; namely, to protect the public from future crime by the offender and others, and to punish the offender. R.C. 2929.11(A). The court must consider the need for "incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." Id.
 {¶ 160} Keeping those purposes in mind, if the offender has not previously served a prison term, R.C. 2929.14(B) presumes the imposition of the shortest prison term for an offense. However, the trial court may impose a sentence beyond the minimum term when it specifically finds on the record that the shortest prison term would either demean the seriousness of the offender's conduct or would not adequately protect the public from future crime by the offender. R.C. 2929.14(B). The trial court is not required to give an explanation for this finding. Rather, the trial court "must note that it engaged in the analysis and that it varied from the minimum for at least one of the two sanctioned reasons." Statev. Edmonson, 86 Ohio St.3d 324, 326, 1999-Ohio-110. The seriousness and recidivism factors are listed in R.C. 2929.12.
 {¶ 161} The trial court stated that it considered the purposes of the felony sentencing statute enumerated under R.C. 2929.11 when it sentenced Bunch. (Sentencing Tr. 41). Furthermore, the trial court discussed the seriousness and recidivism factors listed in R.C. 2929.12(B). (Sentencing Tr. 42). Specifically, the trial court found that the crime was more serious due to the victim's age, that she suffered serious physical, psychological and economic harm, and the fact that these men got together to go out and commit crimes against anyone who happened to be in their way. (Sentencing Tr. 42-43). It also found that none of the factors that make the crime less serious were applicable. (Sentencing Tr. 43). As to the recidivism factors, the trial court stated that Bunch had a prior juvenile record and he had not responded favorably to sanctions previously imposed in juvenile court. (Sentencing Tr. 43).
 {¶ 162} Bunch finds fault with the trial court's finding that the victim's age exacerbated the injury and the finding that these men were going out and committing the crimes against anyone who happened to be in their way. As to the finding regarding age, Bunch may be correct. M.K. was twenty-two years old when the crimes occurred. In considering the age of the victim exacerbating the injury, realistically this factor applies when the victim is extremely young or old. The trial court gave no explanation for applying this factor. Merely finding that her age at twenty-two exacerbates the injury implies that there is no age at which the trial court will not apply this factor. Thus, the record does not reflect that her age exacerbated the injury.
 {¶ 163} As to the finding that the crimes were committed against anyone who was in their way, this was a proper finding. While this exact factor is not listed in the statute, this characterization of the crime indicates that it could fall under R.C. 2929.12(B)(7), the crime was committed as part of an "organized criminal activity." However, even if it did not fit under that subsection, it still could be considered an applicable factor since R.C. 2929.12(B) is not an all inclusive list. It specifically indicates that any other relevant factor can be used for a seriousness factor. R.C. 2929.12(B). Thus, this factor could be considered.
 {¶ 164} To sum up, even though the trial court should not have relied on M.K.'s age for a seriousness factor, all other seriousness factors it relied on were applicable. Thus, no reversible error occurred. Bunch's arguments as to those findings fail.
 {¶ 165} The trial court, after engaging in the above analysis, determined that even though Bunch had not served a prison term, the minimum sentence would demean the seriousness of the offenses and could not adequately protect the public. This finding met the statutory requirements in R.C. 2929.14(B) for finding that more than a minimum sentence was needed.
 {¶ 166} Furthermore, the Supreme Court has recently explained that a sentencing court is not required to make findings that permit it to exceed the minimum sentence when it imposes the maximum sentence as long as it made proper maximum sentence findings pursuant to R.C. 2929.14(C).State v. Evans, 102 Ohio St.3d 240, 2004-Ohio-2659. The trial court sentenced Bunch to the maximum sentences for all felony convictions. Thus, even though the trial court made the proper findings under R.C.2929.14(B), it was not required to as long as it made the proper maximum sentence findings under R.C. 2929.14(C).
 {¶ 167} R.C. 2929.14(C) indicates that a trial court may impose the longest prison term authorized for the offense only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders, and upon certain repeat violent offenders. The trial court must state one of these findings and provide reasons supporting the finding on the record at the sentencing hearing in order for a maximum sentence to be upheld. R.C. 2929.19(B)(2)(d); State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165.
 {¶ 168} In imposing the maximum sentence for all felony convictions, the court found that Bunch committed the worst form of the offenses and that he posed the greatest likelihood of committing future crimes. (Sentencing Tr. 45). As to the worst form of the offense finding, the trial court stated, "I think everyone who knows anything about this case would agree that that finding must be made by the Court." (Sentencing Tr. 45). Later it explained that the crimes were so random and represented the ultimate act of dishonor and disrespect for everything that is decent and holy in society. (Sentencing Tr. 46). It described the crime as the most vicious, evil and unforgivable crime it ever saw. (Sentencing Tr. 48). It explained that during the victim's testimony it could feel her terror and fear. (Sentencing Tr. 48). As to the greatest likelihood of committing future crimes, the trial court stated that it believed that Bunch was "most likely" to commit future crimes. (Sentencing Tr. 45).
 {¶ 169} Bunch finds fault with the court's determination that it was the worst form of the offense. He contends that the rape and complicity to commit rape charges were not the worst form of the offense because she did not get a disease, it was relatively short in duration and she did not get shot. He states that the aggravated robbery was not the worst form of the offense because M.K. was not shot during the robbery and it was "relatively short" in duration. He asserts that the conspiracy charge is no different from any other conspiracy. He also advances practically the same arguments for the kidnapping conviction.
 {¶ 170} The state counters these arguments by contending that due to the nature of the crimes, these were the worst forms of the offenses. The state maintains that the short duration of the offenses does not take away from the brutality of the crimes.
 {¶ 171} As to the rapes, the state is correct. Bunch and Moore brutally gang raped M.K. They each took turns orally raping her as the other one pointed a gun at her. Additionally, one would vaginally rape her while the other one orally raped her. This is easily considered the worst form of the offense.
 {¶ 172} Regarding the aggravated robbery and kidnapping, while M.K. was not shot at or shot, given the facts, this still could be considered the worst form of the offense. During the robbery and kidnapping she had two guns pointing at her, and Moore was digitally penetrating her. While each of the crimes (rape, aggravated robbery and kidnapping) had different objectives, the closeness in proximity to each other rendered these the worst form of the offense. During the commission of each of these offenses, she had a fear that not only would she be shot, but also that these men were going to take her to some secluded place to rape and kill her. The way that this crime occurred could support the determination that it was the worst form of the offenses of aggravated robbery and kidnapping.
 {¶ 173} Concerning the conspiracy charge, since we have vacated the conspiracy conviction and dismissed that count from the indictment, Bunch's worst form of the offense argument is rendered moot. In conclusion, the trial court made the worst form of the offense finding and provided reasons supporting that finding. Clearly, the record supports the finding that the rape offense was the worst form of the offense. Furthermore, the record also supports the finding that the aggravated robbery and kidnapping were the worst form of the offense. However, even if we were to conclude that it was not the worst form of the offense for the aggravated robbery and kidnapping offenses, the trial court also made the greatest likelihood of recidivism findings.
 {¶ 174} The trial court stated that it "firmly" believed that Bunch was "most likely to commit future crimes." (Sentencing Tr. 45). This is equivalent to a finding of the greatest likelihood of recidivism. In support of this finding, the trial court referenced Bunch's juvenile record and that he had not responded favorably to sanctions previously imposed. (Sentencing Tr. 43). Bunch's juvenile record reveals adjudications for aggravated menacing, possession of drugs, probation violations, unauthorized use of a motor vehicle, and resisting arrest.
 {¶ 175} There is a split among the appellate district as to whether an offender's juvenile record can be used to support the greatest likelihood of recidivism finding. The Eleventh Appellate District has reasoned that considering the juvenile record and failing to respond favorably to those sanctions can be used to determine that an offender posed the greatest likelihood of recidivism. State v. Clemens (2001), 145 Ohio App.3d 299,303. However, the Fourth Appellate District has reasoned that if the juvenile record of the offender only amounts to misdemeanors if committed by an adult, even though they may be violent offenses, the juvenile record alone may not support a greatest likelihood of recidivism finding. State v. Steward, 4th Dist. No. 02CA43, 2003-Ohio-4082, ¶ 28. It stated, "in fact, the imposition of such a lengthy sentence on such a youthful offender may encourage rather than discourage future criminal conduct by [the offender], causing [the offender] to become a hardened career criminal rather than punishing him for his crimes but providing him a chance to turn his life around." Id.
 {¶ 176} We agree with the Eleventh Appellate District. An offender's juvenile record can be used to support the greatest likelihood of recidivism finding. Thus, Bunch's juvenile record supported the greatest likelihood of recidivism finding. Accordingly, for all the above stated reasons, the trial court did not err in imposing maximum sentences.
 B. CONSECUTIVE SENTENCES {¶ 177} Consecutive sentences are reserved for the worst offense and for the worst offenders. R.C. 2929.14(E)(4)(a)-(c). Therefore, R.C.2929.12(E)(4) provides requirements for the imposition of consecutive sentences when an offender is convicted of multiple offenses. This statute requires the trial court to make four findings and give reasons supporting each of those findings. R.C. 2929.19(B)(2)(c). See, also,Comer, 99 Ohio St.3d 463. The reasons supporting each finding must "align" with the finding it supports. Comer, 99 Ohio St.3d 463. As Comer
explained:
 {¶ 178} "While consecutive sentences are permissible under the law, a trial court must clearly align each rationale with the specific finding to support its decision to impose consecutive sentences. These findings and reasons must be articulated by the trial court so an appellate court can conduct a meaningful review of the sentencing decision." Id. at ¶ 21.
 {¶ 179} Under R.C. 2929.14(E)(4), the first finding the trial court is required to find is that consecutive sentences are necessary to either protect the public from future crimes or to punish the offender. R.C.2929.14(E)(4). Second, the trial court must find that the sentences are not disproportionate to the seriousness of the offender's conduct. R.C.2929.14(E)(4). Third, the trial court must find that consecutive sentences are not disproportionate to the danger the offender poses to the public. R.C. 2929.14(E)(4). Lastly, the trial court must make one of the following three findings:
 {¶ 180} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 181} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 182} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." R.C. 2929.14(E)(4)(a), (b), and (c).
 {¶ 183} The record indicates that the trial court made some, but not all, of the findings required by R.C. 2929.14(E)(4). The trial court stated that consecutive sentences were necessary to punish and to protect the public from future crimes. (Sentencing Tr. 49). Therefore, it satisfied the first finding.
 {¶ 184} We now address the second and third required findings outlined in R.C. 2929.14(E)(4), namely, that consecutive sentences are proportionate to the seriousness of the offender's conduct and proportionate to the danger that the offender posses to the public. The trial court did find that, "because you have committed the worst form of each of these offenses and posed the greatest likelihood of committing future crimes and because the harm is so great and unusual, that a single term does not adequately reflect the seriousness of your conduct." (Sentencing Tr. 50). However, this statement corresponds with one of the three possible findings under the fourth remaining finding. Namely, it corresponds with the finding enumerated in R.C. 2929.14(E)(4)(b) — "the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."
 {¶ 185} In some sense, the findings required by R.C. 2929.14(E)(4) overlap with the others and are redundant. See State v. Kimbrough (Mar. 2, 2000), 8th Dist. Nos. 75642, 75643, 75644. For example, if the court finds that "consecutive sentences are necessary to protect the public from future crime by the offender," then it has also necessarily found that consecutive sentences are "necessary to protect the public from future crime or to punish the offender." The statute lists these as two separate findings, when one finding clearly encompasses the other. There is also a high degree of overlap between the finding that "consecutive sentences are not disproportionate to seriousness of the offender's conduct" and the finding that "no single prison term * * * adequately reflects the seriousness of the offender's conduct." Due to this overlap in the language of the statute, it is possible that the trial court made the appropriate findings, even without tracking the precise language of the statute. This is especially so when considering our prior holdings that when imposing consecutive sentences, the trial court does not have to recite the exact language of the statute as if the statutory language was some sort of magic or talismanic formula. State v. Howard, 7th Dist. No. 02BA9, 2003-Ohio-804.
 {¶ 186} That said, even if we were to find that given the redundancy of the language in the statute, the trial court made all the appropriate findings, it still did not comply with the felony sentencing statute because it did not "align" reasons with each of those findings. Comer,99 Ohio St.3d 463, at ¶ 21. Although the court did give many reasons to support its overall sentence, the reasons do not specifically align the findings made by the court. Thus, for this reason, the trial court erred in imposing consecutive sentences and, accordingly, a new sentencing hearing is warranted. On remand, given Comer's dictate that the reasons must align with the findings, it may be safest for the trial court's words to specifically track the wording of the statute. State v. Morton,147 Ohio App.3d 43, 2002-Ohio-813, ¶ 108-109.
 {¶ 187} As an aside, this court takes this opportunity to address the trial court's statement during sentencing that if you commit two crimesyou get two sentences. (Tr. 49). It stated it went by this philosophy because "to do anything else would give you [a defendant] a free pass to commit all the crimes you like after you commit the first one." (Tr. 49). While this may be the trial court's belief, under Senate Bill 2, it is not a sufficient reason or justification for ordering consecutive sentences. Thus, on remand, the trial court must not consider thiscriteria in determining whether consecutive sentences are appropriate.
 C. ALLIED OFFENSES OF SIMILAR IMPORT {¶ 188} Next, Bunch argues that many of the offenses are allied offenses of similar import and, as such, consecutive sentences are prohibited for allied offenses of similar import. He contends that the three rape counts are allied offenses of similar import, that the three counts of complicity to rape counts are allied offenses of similar import and that complicity to rape and rape are also allied offenses of similar import. He additionally maintains that the kidnapping charge was an allied offense of similar import to rape and/or aggravated robbery. He further contends that aggravated robbery and conspiracy to aggravated robbery are allied offenses of similar import and must merge for sentencing purposes. His ultimate contention is that the trial court should have sentenced him only to two offenses — rape and aggravated robbery.
 {¶ 189} Allied offenses of similar import are explained in R.C. 2941.25, which states:
 {¶ 190} "(A) Where the same conduct by a defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 191} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 192} The test for determining if two crimes are allied offenses of similar import is a two-prong test. The first prong is whether the elements of the crimes "correspond to such a degree that the commission of one crime will result in the commission of the other." State v.Rance, 85 Ohio St.3d 632, 636, 1999-Ohio-291, quoting State v.Blankenship (1988), 38 Ohio St.3d 116, 117. Under this analysis, the elements of the crimes are compared in the abstract. Rance,85 Ohio St.3d at 636. "If the elements do not so correspond, the offenses are of dissimilar import and the court's inquiry ends — the multiple convictions are permitted." Rance, 85 Ohio St.3d at 636, citing R.C.2941.25(B). However, if the elements do so correspond, the court must move to the second prong of the test — whether the crimes were committed separately or with separate animus. Id. at 638-639, citing R.C. 2941.25(B) and State v. Jones, 78 Ohio St.3d 12, 18, 1997-Ohio-38. If the crimes were committed separately or with separate animus, the defendant may be convicted and sentenced to each of the multiple offenses. Rance,85 Ohio St.3d at 636. But if it is determined that they were not committed separately or with separate animus then a defendant cannot be convicted and sentenced to each crime separately. Id.
 1. RAPE COUNTS {¶ 193} Bunch contends that the three rape counts (vaginal, oral and anal) are allied offenses of similar import. He argues that when comparing the rape counts, it is clear the commission of one rape results in the commission of the other counts of rape, especially when considering the short duration in which the rapes occurred. The state, on the other hand, claims that the sexual conduct convicted of is three different types of sexual conduct; therefore, they are not allied offenses of similar import.
 {¶ 194} The elements of the rapes when viewed in the abstract correspond since they are the same offenses. Thus, our analysis turns to whether the rapes were committed separately or with separate animus.
 {¶ 195} Other districts have held that different types of rape are distinct and separate acts and, thus, a defendant can be convicted and sentenced for each type of rape. The Eleventh Appellate District has held that a defendant convicted of one count of anal rape, one count of vaginal rape, one count of rape by fellatio, and one count of rape by means of forcing the victim to digitally penetrate her anus were distinct and separate sexual acts. State v. Ludwick, 11th Dist. No. 2002-A-0024, 2004-Ohio-1152. In situations where there are different and distinct instances, even though they may be in close proximity, we are not dealing with a single, simultaneous act but multiple offenses. State v.Washington, 10th Dist. No. 01AP-727, 2002-Ohio-2086, citing State v.Barnes (1981), 68 Ohio St.2d 13, 14, State v. Ware (1977),53 Ohio App.2d 210, 211 (finding that the commission of anal rape after vaginal rape constituted two separate acts of rape); State v.Moralevitz (1980), 70 Ohio App.2d 20, 28 (finding that three separate acts of sexual contact in the same time period constituted offenses of "similar kind committed separately" and were not allied offenses of similar import); State v. Degroat (Sept. 6, 2001), 10th Dist. No. 00AP-1485 (finding the state's recitation of facts sufficient to impose separate sentences for multiple gross sexual imposition convictions).
 {¶ 196} Likewise, the Ohio Supreme Court has held that crimes involving vaginal intercourse, cunnilingus, and digital penetration are separate crimes with a separate animus. State v. Nicholas (1993),66 Ohio St.3d 431, 435 (the Nicholas Court stated the different types of rape were not allied offenses of similar import. Although Nicholas was decided prior to Rance, it determined that the different types of rape were separate crimes with separate animus.). In Nicholas, as in the case before us, all of the acts occurred during a relatively short period of time. Even considering this factor, the Court's rationale was that the three crimes involved separate and distinct sexual activity. Id.
 {¶ 197} In the matter at hand, M.K. testified that Bunch had orally and vaginally raped her more than once. She testified that she was also anally raped, but that she was unsure who committed this act. Callier confirmed that Bunch orally and vaginally raped her, however, he also stated that Bunch was the one who anally raped M.K. Thus, there are three separate rapes that occurred. As such, following the Ohio Supreme Court and our sister districts' reasoning, we conclude that the rapes were separate crimes with separate animus. Thus, merger was not required.
 {¶ 198} As to the three counts of complicity to rape, the above analysis equally applies to them. The elements of complicity to rape when viewed in the abstract correspond. However, following the same reasoning as above, they were separate crimes with separate animus. Bunch held M.K.'s head and pointed a gun at her while Moore orally raped her, pointed a gun at her while Moore vaginally raped and digitally penetrated her, orally raped her to aid Moore in vaginally raping her, and vaginally raped her to aid Moore in orally raping her. Thus, merger was not required.
 2. RAPE AND KIDNAPPING {¶ 199} Rape, pursuant to R.C. 2907.02(A)(2), requires proof that Bunch engaged in sexual conduct with the victim having purposely compelled the victim to submit by force or threat of force. Kidnapping, under R.C. 2905.01(A)(4), requires proof that Bunch did, by force, threat or deception restrain the victim from her liberty, with purpose to engage in sexual activity, as defined by R.C. 2907.01, with the victim against her will.
 {¶ 200} The Eighth Appellate District has held that kidnapping and rape are not allied offenses of similar import. State v. White (1999),135 Ohio App.3d 481, 4894-90. In coming to this determination it relied on the fact that the crimes were committed separately or with separate animus. Id. In White, the victim testified that the defendant stalked her, i.e. he continually drove by her as she waited for a bus. The victim went on to explain that while she attempted to find a safe place, defendant grabbed her, threatened to kill her, and dragged her across campus. She explained that he then took her around the back of one of the buildings and down a flight of stairs where he raped her.
 {¶ 201} In making the determination that kidnapping and rape were not allied offenses of similar import, the Eighth Appellate District relied heavily upon the facts in the case. In making its determination, it referenced and applied the Ohio Supreme Court's reasoning in State v.Logan (1979), 60 Ohio St.2d 126, 135.
 {¶ 202} In Logan, the Ohio Supreme Court provided some guidance to determine whether kidnapping and another offense are of the same or similar kind and committed with a separate animus. Id. It stated:
 {¶ 203} "(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions." Id.
 {¶ 204} The Supreme Court held that, where a victim was forced from an alley down a flight of stairs before being raped, the kidnapping and rape were allied offenses of similar import. Id. Logan was decided beforeRance and it dictates that the elements of the crime are to be compared in the abstract. However, the Supreme Court recently has relied on theLogan guidelines to determine whether kidnapping and rape were committed separately or with separate animus. State v. Adams, 103 Ohio St.3d 508,2004-Ohio-5845, ¶ 89-92 (not discussing Rance or whether the elements of rape and kidnapping where compared in the abstract).
 {¶ 205} Applying the Logan guidelines, we find that the rapes and kidnapping were not allied offenses of similar import. Here, like inWhite, the movement of M.K. from the address on Detroit Avenue to where the rape occurred at the dead-end near Pyatt Street was "substantial so as to demonstrate a significance independent" of the rapes. Thus, merger was not required.
 3. AGGRAVATED ROBBERY AND KIDNAPPING {¶ 206} The First Appellate District has explained:
 {¶ 207} "The application of the Rance test to aggravated robbery and kidnapping reveals that they are not allied offenses. The aggravated-robbery statute, R.C. 2911.01(A)(1), provides that `[n]o person, in attempting or committing a theft offense * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.' By contrast, the kidnapping statute, R.C. 2905.01(A)(2), provides that `[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o facilitate the commission of any felony or flight thereafter.' Each offense has at least one element that the other does not, so, underRance, they are not allied offenses. See State v. Robinson, 8th Dist. No. 80718, 2003-Ohio-156, ¶ 40." State v. Walker, 1st Dist. No. C-030159, 2003-Ohio-7106.
 {¶ 208} Likewise, the Eighth Appellate District has held that each of these crimes requires proof of an element not included in the other.State v. Cobbins, 8th Dist. No. 82510, 2004-Ohio-3736. It reasoned that aggravated robbery and kidnapping are distinguishable because the elements do not correspond to such a degree that the commission of one will result in the commission of the other. Id.
 {¶ 209} We find the reasoning of our sister district is persuasive. Thus, the offenses of kidnapping and aggravated robbery are not allied offenses of similar import that require merger.
 4. COMPLICITY TO RAPE AND RAPE {¶ 210} Previously the elements of rape have been defined as no person shall engage in sexual conduct with another by use of force or threat of force. R.C. 2907.02(A)(2). Complicity to rape is defined in R.C.2923.03(A)(2) as aiding and abetting another in the commission of a rape.
 {¶ 211} Considering those elements in the abstract, we find that the elements correspond to such a degree that the commission of one crime will result in the commission of another. See State v. McNeir (Nov. 30, 2000), 6th Dist. No L-99-1406 (providing no reasoning, but holding that complicity to commit aggravated robbery and aggravated robbery are allied offenses of similar import).
 {¶ 212} Thus, we must determine whether the crimes were committed separately or with separate animus. As stated earlier, entry into separate orifices constitutes separate acts of rape. Nicholas,66 Ohio St.3d at 435; Barnes, 68 Ohio St.2d at 14; Ludwick, 11th Dist. No. 2002-A-0024, 2004-Ohio-1152.
 {¶ 213} The complicity and rape counts charged under R.C. 2923.03(A)(2) (complicity) and R.C. 2907.02(A)(2) (rape) consist of Bunch holding M.K.'s head while Moore raped her, Bunch orally raping her to aid Moore's vaginal rape of her and Bunch vaginally raping her to aid Moore's oral rape of her.
 {¶ 214} In Barnes, the Ohio Supreme Court explained that:
 {¶ 215} "One should not be allowed to take advantage of the fact that he has already committed one sexual assault on the victim and thereby be permitted to commit further assaults on the same person with no risk of further punishment for each assault committed. Each act is a further denigration of the victim's integrity and a further danger to the victim." Barnes, 68 Ohio St.2d at 14.
 {¶ 216} This reasoning equally applies when considering whether the complicity was committed separately or with a separate animus from the rape counts. Each act Bunch committed to aid Moore in another act of rape whether it was a forceful grab of the head, the pointing of a gun, a push to the ground or the rape act itself to permit the co-defendant's rape of M.K. furthered each successive criminal act of rape committed against M.K. and warranted its own criminal punishment.
 {¶ 217} For these reasons, Bunch's argument lacks merit. Accordingly, we hold that the facts of this case compel a conclusion that complicity to rape and rape are not allied offenses of similar import requiring merger.
 5. CONSPIRACY TO AGGRAVATED ROBBERY AND AGGRAVATED ROBBERY {¶ 218} Bunch argues that aggravated robbery and conspiracy to aggravated robbery are allied offense of similar import. As aforementioned, the conspiracy conviction and sentence is vacated. Thus, our disposition of the conspiracy conviction renders this argument moot.
 D. VICTIM IMPACT STATEMENTS {¶ 219} At sentencing, both M.K. and her father gave victim impact statements. Bunch claims the trial court's allowance of this violated his due process rights.
 {¶ 220} The purpose of a victim impact statement is to help inform the trial court of the actual harm inflicted upon the victim and the victim's family by the crime. State v. Smith, 2d Dist. No. 2001-CA-25, 2001-Ohio-1643. According to R.C. 2929.19(A), either the victim or the victim's representative, and any other person with approval of the trial court, may speak at the sentencing hearing.
 {¶ 221} M.K. clearly is the victim in this case. Thus, in accordance with the clear language of the statute, once she spoke, her representative could not speak at the sentencing hearing. However, the use of the word "and" in the statute would allow any other person to speak in conjunction with the victim or the victim's representative if the trial court approved. It is within the trial court's discretion to allow any other person/persons to speak at the hearing. See State v. Harwell,149 Ohio App.3d 147, 150, 2002-Ohio-4349.
 {¶ 222} The record before this court does not indicate that M.K.'s father was speaking as her representative. Thus, it could be concluded that he fell into the "any other person" category. R.C. 2929.19(A)(1) provides that the trial court has the discretion to permit any person with information relevant to the imposition of sentence to speak at the sentencing hearing. State v. Agner, 3d Dist. No. 8-01-25, 2002-Ohio2-352, ¶ 15.
 {¶ 223} M.K.'s father's statement, which was roughly one page in duration, referenced the impact that the crime has had on him. He was the only family member who spoke at the hearing. Bunch did not object to M.K.'s father making a statement. Thus, he waives all but plain error. It is difficult to see how the trial court abused its discretion in allowing this statement, let alone how this alleged error amounted to plain error. Thus, this argument fails.
 {¶ 224} In conclusion, this assignment of error is meritorious in part and lacks merit in part. The conspiracy conviction is vacated due to the inadequacy of the indictment. Furthermore, none of the remaining offenses required merger. Regarding sentencing, the trial court did not err in allowing M.K. and her father to make statements during sentencing. The trial court made the appropriate maximum sentence findings and reasons supporting those findings of the record. However, the trial court did not comply with R.C. 2929.14(E) in making its consecutive sentence findings. Thus, the sentences are vacated and the proceeding is remanded for a new sentencing hearing. While we have found no error with the trial court's imposition of maximum sentences, at the new sentencing hearing the trial court must still make the maximum sentence findings and provide reasons supporting those findings on the record. State v. Gist (Dec. 17, 2003), 7th Dist. No. 03CO10, 2003-Ohio-7018.
 ASSIGNMENT OF ERROR NUMBER FIVE {¶ 225} "The trial court erred in imposing multiple, consecutive terms of imprisonment for the firearm specifications as all of the felonies were committed as part of the same act or transaction."
 {¶ 226} Bunch was convicted of nine felonies, all had firearm specifications. He was found guilty of all the firearm specifications. The trial court sentenced Bunch to three years for each of the firearm specifications to be served consecutively to each other. Thus, for the firearm specifications he was sentenced to nine terms of actual incarceration, i.e. twenty-seven years.
 {¶ 227} The conspiracy count is included in the nine felony counts in which Bunch was found guilty. As aforementioned the conspiracy conviction is vacated, as is the concomitant firearm specification. Accordingly, the gun specifications dealt with in this assignment of error are for the remaining eight felonies: three counts of rape; three counts of complicity to rape; kidnapping; and aggravated robbery.
 {¶ 228} Bunch contends that the trial court erred in failing to merge the firearm specifications into one sentence. Bunch relies on R.C.2929.14(D)(1)(b) which states that the trial court shall not impose more that one three year prison term for a firearm specification on an offender "for felonies committed as part of the same act or transaction." He contends that the felonies committed in this case were part of the same transaction and, thus, the trial court erred by failing to merge the firearm specification sentences.
 {¶ 229} The Ohio Supreme Court has defined the word "transaction," as it is used in R.C. 2929.71(B). State v. Wills, 69 Ohio St.3d 690, 691,1994-Ohio-417. A "transaction" is "a series of continuous acts bound together by time, space and purpose, and directed toward a single objective." Id. quoting State v. Caldwell (Dec. 4, 1991), 9th Dist. No. 14720. See, also, State v. Stilson (Dec. 13, 1996), 4th Dist. No. 95CA28 (stating that the offenses must be part of the same "criminal adventure" to merge the firearm specifications); State v. Krupa, 7th Dist. No. 02BA25, 2003-Ohio3-554. In determining whether the crimes arise from a single transaction, appellate courts have focused primarily upon whether the defendant acted with a single purpose or objective. See, e.g., Statev. Emanuel (Sept. 19, 1996), 10th Dist. No. 96APA01-59 (collecting case law on this point). If there was singleness of purpose, the courts have held that merger of the firearm specifications is required. Id. This is a different test than the separate animus test used for determining allied offenses of similar import as found in R.C. 2941.25(B). State v. Salinas
(1997), 124 Ohio App.3d 379, 388.
 {¶ 230} Using the above test, the evidence reveals at most three overall objectives in Bunch's crime spree against M.K. The first objective was robbery. While Moore was driving M.K.'s car with her in it, Bunch got in and demanded money and her diamond earrings and threatened to kill her. Once M.K. handed over all her possessions, Moore and Bunch continued to drive M.K.'s car with M.K. in it and two guns pointed at her. It was at this point that the objective changed from robbery to kidnapping.
 {¶ 231} The kidnapping objective continued until Moore and Bunch reached the dead end near Pyatt Street. M.K. was then ordered out of the car and forced to the ground at gun point. Moore and Bunch then carried out a series of brutal rapes against M.K. Thus, at that point the objective changed from kidnapping to rape.
 {¶ 232} Consequently, the evidence supports the justification of at most three gun specifications, not eight. Thus, this assignment of error is sustained in part. Upon remand for resentencing, the trial court is limited to imposing, at most, three separate prison terms for the combined firearm specifications in counts one, four, five, six, seven, eight, nine, and ten (relating to the aggravated robbery, rape, complicity to rape and kidnapping of M.K.).
 CONCLUSION {¶ 233} For the foregoing reasons, the conviction and sentence is affirmed in part, reversed in part, vacated in part and remanded for resentencing. The conspiracy conviction and sentence of eight years is vacated, as is the concomitant firearm specification and three-year sentence. All other convictions are affirmed. As to sentencing, the trial court complied with the felony sentencing statute in imposing maximum sentences. However, it failed to comply with the felony sentencing statute in its imposition of consecutive sentences. Thus, the sentences are reversed, vacated and remanded for resentencing. As aforementioned, although no error was committed in imposing the maximum sentences, at the new sentencing hearing, the trial court must make both the maximum and consecutive sentence findings and align reasons for those findings on the record. The trial court's imposition of three-year gun specifications to be served consecutively for a total of twenty-seven years is reversed. As explained above, upon remand, the trial court is limited to imposing at most three separate prison terms for the gun specifications. At resentencing, Bunch could be sentenced to serve, at most, three consecutive three-year gun specifications for a total of nine years. Thus, if the trial court on remand makes the appropriate findings and reasons for the imposition of maximum and consecutive sentences, Bunch's sentence at most could be 89 years: ten years for each of the three rape convictions; ten years for each of the three complicity to rape convictions; ten years for the kidnapping conviction; ten years for aggravated robbery conviction; and nine years for the three remaining gun specifications.
Waite, J., concurs.
DeGenaro, J., concurs in judgment only; see concurring in judgment only opinion.